Volume 1 of 2

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| NORTH CAROLINA RIGHT TO LIFE, INCORPORATED, *Plaintiff-Appellant,* and NORTH CAROLINA RIGHT TO LIFE POLITICAL ACTION COMMITTEE; NORTH CAROLINA RIGHT TO LIFE COMMITTEE FUND FOR INDEPENDENT POLITICAL EXPENDITURES, *Plaintiffs,* v. LARRY LEAKE, in his official capacity as Chairman of the North Carolina State Board of Elections; ROY COOPER; GENEVIEVE C. SIMS, in her official capacity as Secretary of the State Board of Elections; ROBERT CORDLE, in his official capacity as a member of the State Board of Elections; LORRAINE G. SHINN, in her official capacity as a member of the State Board of Elections; CHARLES WINFREE, in his official capacity as a member of the State Board of Elections; ROBERT F. JOHNSON, in his official capacity as District Attorney for North Carolina Prosecutorial District 15A, *Defendants-Appellees.* | No. 07-1438 |

NORTH CAROLINA RIGHT TO LIFE, INCORPORATED; NORTH CAROLINA RIGHT TO LIFE POLITICAL ACTION COMMITTEE; NORTH CAROLINA RIGHT TO LIFE COMMITTEE FUND FOR INDEPENDENT POLITICAL EXPENDITURES,

*Plaintiffs-Appellees,*

v.

LARRY LEAKE, in his official capacity as Chairman of the North Carolina State Board of Elections; ROY COOPER; GENEVIEVE C. SIMS, in her official capacity as Secretary of the State Board of Elections; ROBERT CORDLE, in his official capacity as a member of the State Board of Elections; LORRAINE G. SHINN, in her official capacity as a member of the State Board of Elections; CHARLES WINFREE, in his official capacity as a member of the State Board of Elections; ROBERT F. JOHNSON, in his official capacity as District Attorney for North Carolina Prosecutorial District 15A,

*Defendants-Appellants.*

No. 07-1439

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, District Judge. (5:99-cv-00798-BO)

Argued: December 4, 2007

Decided: May 1, 2008

Before WILLIAMS, Chief Judge, and WILKINSON and
MICHAEL, Circuit Judges.

---

Affirmed in part and reversed in part by published opinion. Judge
Wilkinson wrote the majority opinion, in which Chief Judge Williams
joined. Judge Michael wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** James Bopp, Jr., BOPP, COLESON & BOSTROM, Terre
Haute, Indiana, for Appellant/Cross-Appellees. Susan Kelly Nichols,
Special Deputy Attorney General, NORTH CAROLINA DEPART-
MENT OF JUSTICE, Raleigh, North Carolina, for Appellees/Cross-
Appellants. **ON BRIEF:** Richard E. Coleson, Jeffrey P. Gallant,
BOPP, COLESON & BOSTROM, Terre Haute, Indiana, for
Appellant/Cross-Appellees. Roy Cooper, Attorney General, Alexan-
der McC. Peters, Special Deputy Attorney General, NORTH CARO-
LINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for
Appellees/Cross-Appellants.

---

## OPINION

WILKINSON, Circuit Judge:

In this case, North Carolina Right to Life, Inc. ("NCRL") and two
of its affiliated political committees challenge the constitutionality of
various provisions of North Carolina's law governing the financing of
political campaigns. For the reasons that follow, we hold that the pro-
visions in question violate the First and Fourteenth Amendments —
and are hence unenforceable against NCRL, its affiliates, and any
similarly situated entities.

In doing so, we recognize that the law of campaign finance is quite
complicated and in some flux. Courts, state governments, and those
involved in the political process are doing what they can to navigate

this difficult terrain, and we are conscious of the fact that North Carolina went back in good faith to the drawing board to craft a legislative response to our earlier decision in *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999). But it is nevertheless our unflagging obligation to apply constitutional standards to state legislative enactments, and, in doing so here, we find that the provisions before us simply go too far in regulating ordinary political speech to be considered constitutional.

I.

A.

Three related plaintiffs challenge the constitutionality of North Carolina's campaign finance laws. The lead plaintiff is North Carolina Right to Life, Inc. ("NCRL"), a non-profit, membership corporation, incorporated in North Carolina. NCRL's purpose is the protection of human life. In furtherance of that purpose, NCRL, among other things, provides information to the public about abortion and euthanasia. In the past, NCRL has directly contributed to candidates for state office, although it did not do so during the election cycle immediately preceding the commencement of this suit. NCRL claims that its reluctance to contribute resulted from its fear of being designated a "political committee" under North Carolina election law, as such committees are subject to numerous reporting and other requirements.

The other two plaintiffs in this case are distinct legal entities affiliated with NCRL. First, North Carolina Right to Life Political Action Committee ("NCRL-PAC") is an internal political committee established by NCRL in 1982. NCRL-PAC's primary purpose is to engage in express advocacy — the support or opposition of specific candidates and political parties — consistent with the views of NCRL. Second, North Carolina Right to Life Committee Fund for Independent Political Expenditures ("NCRL-FIPE") is a political committee established by NCRL in 1999. NCRL-FIPE's sole purpose is to make independent expenditures, which are defined as those political expenditures "made without consultation or coordination with a candidate or agent of a candidate." N.C. Gen. Stat. § 163-278.6(9a)

(2007). Thus, unlike NCRL and NCRL-PAC, NCRL-FIPE makes no contributions of any kind to political candidates.

### B.

This appeal is the next act in a long drama that has played out in federal court for over a decade. The foundation of the present litigation was laid in 1996, when NCRL filed suit in federal district court arguing that several provisions of the North Carolina campaign finance laws were unconstitutional under the First and Fourteenth Amendments. This court largely agreed with NCRL and struck down many of the laws in *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999) ("*NCRL I*"), *cert. denied*, 528 U.S. 1153 (2000).

In response to this court's decision, the North Carolina General Assembly set out to revise its system of campaign finance regulation. After studying and debating the issue, the General Assembly passed legislation that amended, deleted, and added statutes regulating campaign finance. *See* N.C. Sess. Laws 1999-31, 424, & 453.

On November 30, 1999, immediately after North Carolina obtained pre-clearance from the Department of Justice to implement its new campaign finance regulations, NCRL, NCRL-PAC, and NCRL-FIPE (collectively, "the plaintiffs") filed the present suit against various North Carolina officers in their official capacities (collectively, "North Carolina" or "the defendants"). The plaintiffs sought declaratory and injunctive relief under 42 U.S.C. § 1983 and the First and Fourteenth Amendments, arguing that the court should enjoin the enforcement of five of North Carolina's new campaign finance statutes against the plaintiffs and similarly situated parties.

Three of the plaintiffs' challenges are relevant to this appeal.[1] First, the plaintiffs argued that North Carolina unconstitutionally regulated issue advocacy in prescribing a standard that, through context,

---

[1]The two other statutes challenged by the plaintiffs, N.C. Gen. Stat. § 163-278.12A and N.C. Gen. Stat. § 163-278.39(a)(3), have been repealed. Therefore, these challenges are moot. *See North Carolina Right to Life, Inc. v. Leake*, 482 F. Supp. 2d 686, 697-98 (E.D.N.C. 2007).

attempts to determine if a communication supports or opposes the nomination or election of a particular candidate (the "context prong"). *See* N.C. Gen. Stat. § 163-278.14A(a)(2) (2007). Second, the plaintiffs challenged the constitutionality of North Carolina's definition of "political committee," because it threatened to impose numerous and burdensome obligations on organizations not primarily focused on nominating and electing political candidates. *See id.* § 163-278.6(14). Finally, the plaintiffs argued that North Carolina unconstitutionally applied contribution limits to political committees, such as NCRL-FIPE, which make only independent expenditures and do not contribute to candidates' campaigns. *See id.* § 163-278.13.

On September 23, 2003, this court affirmed the district court's judgment as to the facial unconstitutionality of the "context prong," and the unconstitutionality of the contribution limits, as applied to NCRL-FIPE. *See North Carolina Right to Life v. Leake, Inc.*, 344 F.3d 418, 435 (4th Cir. 2003) ("*NCRL II*"). The court likewise held that the definition of political committee was unconstitutionally overbroad. *Id.* It thus enjoined the enforcement of all of the statutory provisions at issue.

North Carolina subsequently petitioned the Supreme Court for certiorari, asking that the matter be remanded for further consideration in light of the Court's then recent decision in *McConnell v. FEC*, 540 U.S. 93 (2003). On April 26, 2004, the Supreme Court granted North Carolina's petition, vacated this court's decision, and remanded the case to the Fourth Circuit for further consideration in light of *McConnell*. *Leake v. North Carolina Right to Life, Inc.*, 541 U.S. 1007 (2004). This court in turn remanded the case to the district court on August 12, 2004.

On remand, the parties filed cross motions for summary judgment and supporting memoranda addressing the effect of *McConnell*. In addition, North Carolina argued, relying partly on *McConnell*, that the plaintiffs lacked standing because they had failed to take action after the statutes in question had been enjoined.

On March 29, 2007, the district court found that the plaintiffs still had standing to proceed with their challenges.[2] *See North Carolina*

---

[2]We agree with the district court's determination that the plaintiffs have standing to pursue their claims. North Carolina law makes it a mis-

*Right to Life, Inc. v. Leake*, 482 F. Supp. 2d 686, 692-93 (E.D.N.C. 2007). In addition, the district court found that, even after *McConnell*, the context prong remained facially unconstitutional, and North Carolina's contribution limits remained unconstitutional as applied to independent expenditure committees such as NCRL-FIPE. *See id.* at 699-700. Finally, the district court held that North Carolina's definition of political committee was unconstitutional only insofar as it incorporated the context prong. The definition of political committee was left otherwise enforceable. *Id.*

Both parties appeal from this decision. The plaintiffs argue that North Carolina's definition of political committee is unconstitutionally vague and substantially overbroad, and should therefore be enjoined. *See* N.C. Gen. Stat. § 163-278.6(14) (2007). North Carolina challenges the district court's decisions holding the "context prong" facially unconstitutional, *see id.* § 163-278.14A(a)(2), and the contribution limits unconstitutional as applied to NCRL-FIPE, *see id.* § 163-278.13.

II.

We first consider whether North Carolina's method for determining if a communication "supports or opposes the nomination or election

---

demeanor to "intentionally violate[ ]" various North Carolina campaign finance statutes, including the contribution limit at issue in this case and several provisions triggered by North Carolina's definitions of political committee and electoral advocacy. *See* N.C. Gen. Stat. § 163-278.27 (2007).

As we held in *NCRL I*, when a "plaintiff faces a credible threat of prosecution under a criminal statute he has standing to mount a pre-enforcement challenge to that statute." *NCRL I*, 168 F.3d at 710. A statute that "'facially restrict[s] expressive activity by the class to which the plaintiff belongs' presents such a credible threat," *id.* (quoting *New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)), particularly if it threatens to "chill the exercise of First Amendment rights," *NCRL I*, 168 F.3d at 710. Since the statutes challenged by the plaintiffs threaten to subject them to prosecution, and the plaintiffs are therefore "chilled" from engaging in potentially protected First Amendment political expression, standing exists in this case.

of one or more clearly identified candidates" unconstitutionally regulates issue advocacy.

### A.

Many of North Carolina's campaign finance regulations — including, for example, reporting requirements and contribution limits — are focused on campaign expenditures and contributions. *See, e.g.*, *id.* § 163-278.8; § 163-278.11; § 163-278.13. Both "expenditure" and "contribution" are terms of art specifically defined in North Carolina's General Statutes. Expenditures are defined to include any "purchase, advance, conveyance, deposit," etc., made "to support or oppose the nomination [or] election . . . of one or more clearly identified candidates." *Id.* § 163-278.6(9). Contributions — at least "to candidates" — are similarly defined as those "advance[s], conveyance[s]," etc., that are made "to support or oppose the nomination or election of one or more clearly identified candidates." *Id.* § 163-278.6(6). Since the definitions of "expenditure" and "contribution" are both limited — at least in part — by this same verbal formula, the determination as to whether an action is taken "to support or oppose . . . a clearly identified candidate" is thus one of the foundations of North Carolina's campaign finance regulatory scheme.

Section 163-278.14A(a) of North Carolina's General Statutes employs a two-pronged test to determine whether "an individual acted to 'to support or oppose the nomination or election of one or more clearly identified candidates.'" Each of the two prongs of § 163-278.14A(a) delineates a class of "communications." If an individual "financial[ly] sponsor[s]" a "communication" that meets either of the two prongs, he or she is deemed to have acted in support or opposition of a clearly identified candidate.

The first prong of § 163-278.14A(a) classifies communications as supporting or opposing a clearly identified candidate when they explicitly use any of a set of carefully delineated election-related words or phrases. *See id.* § 163-278.14A(a)(1). Examples of such phrases include: "vote for," "reelect," "support," "cast your ballot for," and "(name of candidate) for (name of office)." *Id.*

In an attempt to capture communications that support or oppose candidates while avoiding the use of the words explicitly delineated

by the first prong, the second prong of North Carolina's test considers a communication to be in support or opposition of a candidate if its "essential nature . . . goes beyond a mere discussion of public issues in that [it] direct[s] voters to take some action to nominate, elect, or defeat a candidate in an election." *Id.* § 163-278.14A(a)(2). In particular, if the "essential nature" of a communication is "unclear," the statute states that regulators "may" consider:

> contextual factors such as the language of the communication as a whole, the timing of the communication in relation to events of the day, the distribution of the communication to a significant number of registered voters for that candidate's election, and the cost of the communication . . . in determining whether the action urged could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election.

*Id.*

The plaintiffs in this case argue that the second prong of N.C. Gen. Stat. § 163-278.14A(a) — which attempts to determine the "essential nature" of a communication by considering "contextual factors" — is unconstitutionally overbroad and vague. In particular, the plaintiffs allege that, in enacting this context-based prong, North Carolina's legislature exceeded its limited power to regulate electoral speech and violated the plaintiffs' First and Fourteenth Amendment rights by regulating constitutionally protected political speech. The plaintiffs further contend that "there is no way for a speaker to know in advance how to determine" if their communication falls within the ambit of the context-based prong, therefore rendering § 163-278.14A(a)(2) void for vagueness. *Appellant Reply Brief* at 44.

## B.

Our analysis of § 163-278.14A(a)(2) begins — as does nearly any analysis of the constitutionality of campaign finance regulation — with the Supreme Court's landmark decision in *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam). In *Buckley*, the Court recognized that legislatures have the well established power to regulate elections, *id.* at 13, and that, pursuant to that power, they may establish standards that

govern the financing of political campaigns. In particular, the Court identified "limit[ing] the actuality and appearance of corruption" as an important governmental interest served by campaign finance regulation. *Id.* at 26. The Court simultaneously noted, however, that campaign finance restrictions "operate in an area of the most fundamental First Amendment activities," and thus threaten to limit ordinary "political expression." *Id.* at 14.

The *Buckley* Court therefore recognized the need to cabin legislative authority over elections in a manner that sufficiently safeguards vital First Amendment freedoms. It did so by demarcating a boundary between regulable election-related activity and constitutionally protected political speech: after *Buckley*, campaign finance laws may constitutionally regulate only those actions that are "unambiguously related to the campaign of a particular . . . candidate." *Id.* at 80. This is because only unambiguously campaign related communications have a sufficiently close relationship to the government's acknowledged interest in preventing corruption to be constitutionally regulable. *Id.*

To date, the Court has only recognized two categories of activity that fit within *Buckley*'s unambiguously campaign related standard. First, legislatures may regulate "communications that in express terms advocate the election or defeat of a clearly identified candidate for" public office. *Id.* at 44. In particular, *Buckley* delineated specific words that exemplify such "express advocacy" — words "such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' ' vote against,' 'defeat,' 'reject.'" *Id.* at 44 n.52. *Buckley* thus stands for the proposition that legislatures may constitutionally regulate communications that use the obviously campaign-related "magic words of express advocacy." *See Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652, 2681 (2007) ("*WRTL*") (Scalia, J., dissenting). Focusing regulation in this way ensures that campaign finance restrictions do not sweep so broadly as to restrict ordinary political speech.

Second, the Supreme Court has recently held that legislatures have a very limited authority to regulate campaign communications that are "the functional equivalent of express advocacy." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 206 (2003); *see also WRTL*, 127 S.

Ct. at 2664. Under *Buckley*'s "express advocacy" standard, the Court recognized that advertisers were able to insulate themselves from regulation by simply "eschewing the use of magic words." *McConnell*, 540 U.S. at 193. Since advertisements could be free of magic words, but "no less clearly intended to influence [an] election," the Court stated that strict adherence to *Buckley*'s approach could render the legislative power to regulate elections "functionally meaningless." *Id.*

The Court thus defined a category of activity — beyond the "magic words" identified in *Buckley* — to be regulable as the "functional equivalent of express advocacy." In order to protect political expression, however, the Court has narrowly circumscribed this category, because any attempt to identify communications as election-related without focusing on words that explicitly label them as such threatens to infringe on protected First Amendment liberties. *See WRTL*, 127 S. Ct. at 2663-70.

Therefore, to be considered the "functional equivalent of express advocacy," a communication must meet two separate requirements. First, the communication must qualify as an "electioneering communication," defined by the Bipartisan Campaign Reform Act of 2002 ("BCRA"), 116 Stat. 91, 2 U.S.C. § 434(f)(3)(A)(i) (2000 ed. & Supp. IV), as a "broadcast, cable, or satellite communication" that refers to a "clearly identified candidate" within sixty days of a general election or thirty days of a primary election. *WRTL*, 127 S. Ct. at 2669 n.7 (stating that a communication must meet the "brightline requirements" of the BCRA's definition of "electioneering communication" to be regulable as the "functional equivalent of express advocacy").

Second, a communication can be deemed the "functional equivalent of express advocacy only if [it] is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 2667. The purpose of this requirement is to avoid chilling political expression by forcing a speaker to have to defend his communication from regulation. *See id.* at 2666-67. Thus, for any test to meet the "functional equivalent" standard, it must "eschew 'the open-ended rough-and-tumble of factors,'" which invite burdensome discovery and lengthy litigation. *Id.* at 2666 (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 547 (1995)). Taken together, these two requirements should be suffi-

ciently "protective of political speech" to allow legislatures to regulate beyond *Buckley*'s "magic words" approach. *Id.* at 2669 n.7.

Before we apply these standards to N.C. Gen. Stat. § 163-278.14A(a)(2), a quick summary is in order. Pursuant to their power to regulate elections, legislatures may establish campaign finance laws, so long as those laws are addressed to communications that are unambiguously campaign related. The Supreme Court has identified two categories of communication as being unambiguously campaign related. First, "express advocacy," defined as a communication that uses specific election-related words. Second, "the functional equivalent of express advocacy," defined as an "electioneering communication" that "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." This latter category, in particular, has the potential to trammel vital political speech, and thus regulation of speech as "the functional equivalent of express advocacy" warrants careful judicial scrutiny.

C.

Given the Supreme Court's articulation of the permissible extent of campaign finance legislation, it is clear that N.C. Gen. Stat. § 163-278.14A(a)(2) is unconstitutional. Section 163-278.14A(a)(2) regulates speech that is neither "express advocacy" nor its "functional equivalent" and, therefore, strays too far from the regulation of elections into the regulation of ordinary political speech.

To begin, § 163-278.14A(a)(2) clearly regulates more than "express advocacy." Section 163-278.14A(a)(1) — the first prong of North Carolina's attempt to identify speech that supports or opposes a candidate — codifies *Buckley*'s "magic words"-based approach. Since the context-based prong of § 163-278.14A(a)(2) does not identify speech as regulable by delineating election-related words or phrases, its scope, by definition, extends beyond express advocacy.

To be constitutional, therefore, the regulatory scope of § 163-278.14A(a)(2) must fall within the ambit of the Supreme Court's definition of the "functional equivalent of express advocacy." It does not, however, since it fails to meet either of the two requirements established by the Supreme Court relating to that term of art. First, § 163-

278.14A(a)(2) does not meet the BCRA's definition of "electioneering communication." The BCRA carefully limited the definition of "electioneering communications" to communications that refer to specific people — "clearly identified candidates" — for a specific period of time before an election — thirty days before a primary and sixty days before a general election. In contrast, § 163-278.14A(a)(2) tries to divine the "essential nature" of a communication from the perspective of a "reasonable person," and it does so without explicitly limiting its scope to either specific people or a specific time period.

Second, it cannot be said that communications falling within the ambit of § 163-278.14A(a)(2) are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." As stated earlier, *WRTL* specifically counseled against the use of factor-based standards to define the boundaries of regulable speech, since such standards typically lead to disputes over their meaning and therefore litigation. *See WRTL*, 127 S. Ct. at 2666.

Section 163-278.14A(a)(2) runs directly counter to the teaching of *WRTL* when it determines whether speech is regulable based on how a "reasonable person" interprets a communication in light of four "contextual factors." This sort of *ad hoc*, totality of the circumstances-based approach provides neither fair warning to speakers that their speech will be regulated nor sufficient direction to regulators as to what constitutes political speech. The very terms of North Carolina's statute — including, but not limited to, "essential nature," "the language of the communication as a whole," "the timing of the communication in relation to events of the day," "the distribution of the communication to a significant number of registered voters for that candidate's election," and "the cost of the communication" — are clearly "susceptible" to multiple interpretations and capable of encompassing ordinary political speech unrelated to electoral activity. For instance, how is a speaker — or a regulator for that matter — to know how the "timing" of his comments "relate" to the "events of the day"? Likewise, how many voters would be considered "significant"? And at what "cost" does political speech become regulable?

There is no answer to any of these questions. At least not in the text of § 163-278.14A(a)(2). Neither the regulator nor the regulated can possibly be expected to know when the "essential nature" of speech

is deemed to "direct voters to take some action to nominate, elect, or defeat a candidate in an election" based on these vague criteria. Thus, § 163-278.14A(a)(2) fails to satisfy the second requirement of the Supreme Court's "functional equivalent of express advocacy" approach.

It is in short quite clear that the scope of N.C. Gen. Stat. § 163-278.14A(a)(2) extends beyond both "express advocacy" and its "functional equivalent." Section 163-278.14A(a)(2) is not limited to an express group of election-related words, and its *ad hoc*, context-based, totality of the circumstances approach is "susceptible" of interpretations "other than as an appeal to vote for or against a specific candidate." It is therefore necessary for us to strike § 163-278.14A(a)(2) as unconstitutional.

To do otherwise would offend basic First Amendment values. In limiting campaign finance regulation to "express advocacy" and its "functional equivalent," the Supreme Court struck a balance between the legislature's authority to regulate elections and the public's fundamental First Amendment right to engage in political speech. By carefully defining both of these terms of art, the Court not only cabined the legislature's regulatory power, but it also ensured that potential speakers would have clear notice as to what communications could be regulated, thereby ensuring that political expression would not be chilled.

Section 163-278.14A(a)(2) upsets this balance. Section 163-278.14A(a)(2), as noted, does not conform with the definition of either "express advocacy" or "the functional equivalent of express advocacy," and therefore threatens to regulate the ordinary political speech that is democracy's lifeblood. Whether the speech is pro-life, pro-choice, or somewhere in between makes no difference — it addresses an issue of unquestioned public import, and it is on that account protected. And even if some regulable speech falls within the ambit of § 163-278.14A(a)(2), the statute's open-ended terms do not lend themselves to a principled limiting construction, nor does the State even propose one. *See NCRL II*, 344 F.3d at 428 (finding that § 163-278.14A(a)(2) is not "readily susceptible" to a limiting construction). Furthermore, these same open-ended terms provide little *ex ante* notice to political speakers as to whether their speech will be reg-

ulated. Instead, speakers are left to guess and wonder whether a regulator, applying supple and flexible criteria, will make a *post hoc* determination that their speech is regulable as electoral advocacy. This approach simply guarantees that ordinary political speech will be chilled, the very speech that people use to express themselves on all sides of those issues about which they care most deeply.

In *WRTL*, the Supreme Court noted that "a test based on the actual effect speech will have on an election or a particular segment of the target audience . . . unquestionably chill[s] a substantial amount of political speech." *WRTL*, 127 S. Ct. at 2666. This insight is plainly applicable to § 163-278.14A(a)(2), which employs a test based on the effect a communication has on a "reasonable person" — ostensibly the target audience of most political communication. We therefore hold that § 163-278.14A(a)(2) "unquestionably chill[s] a substantial amount of political speech" and declare the statute unconstitutionally overbroad and vague.[3]

In reaching this conclusion, we recognize that plaintiffs must overcome a "heavy burden" to succeed on a facial challenge to legislation. *McConnell*, 540 U.S. at 207; *see also Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Indeed, our circuit has indicated that the facial invalidation of a statute for overbreadth is "strong medicine to be applied sparingly and only as a last resort." *United Seniors Ass'n, Inc. v. Social Sec. Admin.*, 423 F.3d 397, 406 (4th Cir. 2005) (internal

---

[3]We reject North Carolina's argument that the first sentence of § 163-278.14A(a)(2) is merely an "explicative definition of express advocacy," and therefore constitutional under *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986) ("*MCFL*"). As this court noted in *NCRL II*, the Supreme Court in *MCFL* did look to the "'essential nature'" of a communication in determining whether it constituted "electoral advocacy." *NCRL II*, 344 F.3d at 425 n.2. However, the *MCFL* Court focused on "actual words of advocacy," and § 163-278.14A(a)(2) is not limited to the plain language of a communication in such a fashion. *Id.* This court in *NCRL II* thus stated that the first sentence of § 163-278.14A(a)(2) "impermissibly dilutes the *Buckley* standard" and therefore declared it unconstitutional. Since the first sentence of § 163-278.14A(a)(2) does not meet the criteria for being labeled "the functional equivalent of express advocacy," as developed in *McConnell* and *WRTL*, this analysis has not changed.

quotations omitted). We recognize, of course, that *McConnell* upheld the facial constitutionality of the BCRA's regulation of "the functional equivalent of express advocacy," *see McConnell*, 540 U.S. at 204-06, and that the Court in *WRTL* was entertaining an "as-applied challenge" to the same statute, *see WRTL*, 127 S. Ct. at 2659.

Neither of these cases, however, confronted a statute with the multiple First Amendment deficiencies that North Carolina's definition displays. As discussed above, nothing in BCRA even approached the First Amendment infirmities present here: that is to say the complete lack of notice as to what speech is regulable, and the unguided discretion given to the State to decide when it will move against political speech and when it will not.

The number of as-applied challenges necessary to remedy the overbreadth and vagueness of this multi-factored statutory test would involve many different lawsuits and litigation that would take years to conclude. In the meantime, political speakers would be left at sea, and, worse, subject to the prospect that the State's view of the acceptability of the speaker's point of view would influence whether or not administrative enforcement action was initiated. Nothing in *McConnell*, *WRTL*, or any First Amendment tradition that we know of forces political speakers to incur these sorts of protracted costs to ascertain nothing more than the scope of the most basic right in a democratic society — the right to engage in discussion of issues of unquestioned public importance.

Whatever effect *WRTL* may or may not have had upon *McConnell* (a point on which no circuit court should engage in cloudy crystal ball-gazing), we think that the infirmities of North Carolina's approach — which determines whether speech is regulable based on how a "reasonable person" interprets the speech's "essential nature" in light of four "contextual factors" — are too evident to ignore. Thus, while we reaffirm the principle in *United Seniors Association*, 423 F.3d at 406, that striking down legislation on the basis of facial invalidity is "strong medicine" to be "sparingly" applied, to ignore the challenge here would be to uphold a statute far beyond anything approved in *McConnell*, and in direct contradiction to the most recent formulation by the Supreme Court in this area of campaign finance law.

III.

We next consider whether North Carolina's definition of political committee unconstitutionally burdens political expression.

A.

Although NCRL-PAC and NCRL-FIPE are political committees, NCRL argues vigorously that it is not. Under North Carolina law, political committees face a significant regulatory burden. *See NCRL I*, 168 F.3d at 712 (noting that "the consequences" of being labeled a political committee are "substantial"). Not only must they appoint a treasurer who the State shall train before every election cycle, but they must also file a statement of organization that reveals all financial depository information. *See* N.C. Gen. Stat. § 163-278.7. In addition, political committees face costly and timely disclosure requirements that essentially allow a state to scrutinize in detail an organization's affairs. *See id.* (must self-identify as affiliated with a candidate, political party, or other political committee); *id.* § 163-278.8 (must keep detailed records of and report all disbursements, with additional requirements for "media expenses"); *id.* § 163-278.9 (detailing reports that must be filed with the State Board of Elections); *id.* § 163-278.11 (must report detailed information about donors). Among other regulations, political committees also face limits on the amount of donations they can receive in any one election cycle from any individual or entity. *See id.* § 163-278.13.

Unsurprisingly, given the burdensome consequences of the appellation, "political committee" is a term of art specifically defined by the North Carolina code. Section 163-278.6(14) of North Carolina's General Statutes defines a political committee as:

> a combination of two or more individuals . . . that makes, or accepts anything of value to make, contributions or expenditures and has one or more of the following characteristics:
>
> a. Is controlled by a candidate;

b. Is a political party or executive committee of a political party or is controlled by a political party or executive committee of a political party;

c. Is created by a corporation, business entity, insurance company, labor union, or professional association pursuant to § 163-278.19(b); or

d. Has as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates.

*Id.* § 163-278.6(14), *amended by* N.C. Sess. Laws 2007-391.[4]

The plaintiffs in this case argue that North Carolina's definition of political committee is unconstitutionally overbroad and vague. Specifically, the plaintiffs contend that Supreme Court precedent only permits the regulation of entities that have *the* major purpose of supporting or opposing a candidate, and, therefore, § 163-278.6(14), by regulating entities that have the support or opposition of a candidate as "*a* major purpose," unconstitutionally burdens protected political speech. Furthermore, the plaintiffs argue that the manner in which North Carolina determines an organization's "major purpose" provides little guidance to potentially regulated entities and is thus void for vagueness.

B.

Our analysis of North Carolina's political committee definition begins at precisely the same point as our previous analysis of the "context prong": with *Buckley v. Valeo*'s mandate that campaign finance laws must be "unambiguously related to the campaign of a particular . . . candidate." *See Buckley*, 424 U.S. at 80. As discussed

---

[4]At the time this litigation commenced, § 163-278.6(14) further stated that an entity is "rebuttably presumed to have as a major purpose" the support or opposition of a candidate if it "contributes or expends or both contributes and expends during an election cycle more than three thousand dollars." This monetary disbursement trigger has since been repealed by the North Carolina legislature, so we do not consider it here. *See* N.C. Sess. Laws 2007-391.

earlier, this requirement ensures that the constitutional regulation of elections — and the financing of campaigns, in particular — does not sweep so broadly as to become an unconstitutional infringement on protected political expression.

*Buckley* applied this "unambiguously campaign related" requirement when analyzing the permissible scope of political committee regulation. Since designation as a political committee often entails a significant regulatory burden — as evidenced by the requirements imposed by North Carolina — the Court held that only entities "under the control of a candidate or *the* major purpose of which is the nomination or election of a candidate" can be so designated. *Id.* at 79 (emphasis added).

The parties in this case dispute the meaning of *Buckley*'s directive that only organizations that have "*the* major purpose" of supporting or opposing a candidate can be regulated as a political committee. The plaintiffs contend that the definite article is crucial — the Court meant what it said when it said "*the* major purpose" — and that the support or opposition of a candidate must at least be the primary purpose of an organization for it to be designated as a political committee. Conversely, North Carolina argues that the definite article is not critical — the Court could have just as easily said "*a* major purpose" — and that supporting or opposing a candidate need only be an important goal of an organization for it to be regulable.

Viewed in light of *Buckley*'s goals, it is clear that the importance the plaintiffs attach to the definite article is correct. *Buckley*'s articulation of the permissible scope of political committee regulation is best understood as an empirical judgment as to whether an organization primarily engages in regulable, election-related speech. Thus, the Court in *Buckley* must have been using "*the* major purpose" test to identify organizations that had the election or opposition of a candidate as their only or primary goal — this ensured that the burdens facing a political committee largely fell on election-related speech, rather than on protected political speech. *Id.* (stating that political committees, as defined by "*the* major purpose" test, are "by definition, campaign related"). If organizations were regulable merely for having the support or opposition of a candidate as "*a* major purpose," political committee burdens could fall on organizations primarily engaged in

speech on political issues unrelated to a particular candidate. This would not only contravene both the spirit and the letter of *Buckley*'s "unambiguously campaign related" test, but it would also subject a large quantity of ordinary political speech to regulation. *See, e.g.*, *id.* at 80.

Subsequent case law affirms the plaintiff's interpretation. To begin, the Supreme Court reaffirmed *Buckley*'s "*the* major purpose" test in *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986) ("*MCFL*"). There, the Court stated that an organization could be classified as a political committee if "*the* organization's major purpose may be regarded as campaign activity," and referred to regulable political committees as "groups whose *primary* objective is to influence political campaigns." *Id.* at 262 (emphasis added). Furthermore, *McConnell* recently quoted *Buckley*'s "*the* major purpose" language favorably. *See McConnell*, 540 U.S. at 170 n.64. The Supreme Court has thus not relaxed the requirement that an organization have "*the* major purpose" of supporting or opposing a candidate to be considered a political committee. And given the Supreme Court's direction on this issue, it is unsurprising that a number of lower courts have also adopted *Buckley*'s "*the* major purpose" test in some form, highlighting that regulation as a political committee is only proper if an organization primarily engages in election-related speech. *See, e.g.*, *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1104 n.21 (9th Cir. 2003); *Fed. Election Comm'n v. Machinists Non-partisan Political League*, 655 F.2d 380, 391-92 (D.C.Cir. 1981); *Richey v. Tyson*, 120 F. Supp. 2d 1298, 1311 (S.D. Ala. 2000); *Volle v. Webster*, 69 F. Supp. 2d 171, 174-76 (D. Me. 1999); *New York Civil Liberties Union, Inc. v. Acito*, 459 F. Supp. 75, 84 n.5, 89 (S.D.N.Y. 1978).[5]

---

[5]North Carolina directs this court to its discussion of *Buckley* in *NCRL I. See Appellee Brief* at 63. In that case, we stated that *Buckley* "defined political committee as including only those entities that have as *a* major purpose engaging in express advocacy in support of a candidate." *NCRL I*, 168 F.3d at 712 (emphasis added and omitted).

The question of whether *Buckley* requires a state to show that an entity has "*the*" or "*a*" major purpose of influencing elections to be designated a "political committee" was not before the court in *NCRL I*, however.

Thus, we are convinced that the Court in *Buckley* did indeed mean exactly what it said when it held that an entity must have "*the* major purpose" of supporting or opposing a candidate to be designated a political committee. Narrowly construing the definition of political committee in that way ensures that the burdens of political committee designation only fall on entities whose primary, or only, activities are within the "core" of Congress's power to regulate elections. *Buckley*, 424 U.S. at 79. Permitting the regulation of organizations as political committees when the goal of influencing elections is merely one of multiple "major purposes" threatens the regulation of too much ordinary political speech to be constitutional.

## C.

Given the Supreme Court's insistence that political committees can only be regulated if they have the support or opposition of candidates as their primary purpose, it is clear that N.C. Gen. Stat. § 163-278.6(14) is unconstitutional. In this most sensitive of all areas — political speech — North Carolina has produced the same infirmity with its definition of political committee as it did with its attempt to identify communications that were the functional equivalent of express advocacy. *See supra*, section II. By imposing a political committee designation — and its associated burdens — on entities when influencing elections is only "a major purpose" of the organization, North Carolina not only expands the definition of political committee beyond constitutional limits, but also neglects to provide potentially regulated entities with any idea of how to comply with the law.

---

Our single use of the indefinite article was not intended to lay down a set of criteria or definition of political committee — an issue that only now is the subject of extensive briefing and argument before this court. This court's explicit reservation, in *NCRL II*, of the question of "[w]hether an entity can have multiple major purposes" supports this point. *NCRL II*, 344 F.3d at 429. It would not have been possible for the panel in *NCRL II* to reserve the question of whether *Buckley* requires "*a*" or "*the*" major purpose if *NCRL I* had already decided the issue.

In the event, however, that the use of this one word created later confusion, we regret the miscommunication and acknowledge, as we did at the outset of this decision, our belief that North Carolina has proceeded in this matter in the best of faith.

As noted earlier, the entire aim of *Buckley*'s "*the* major purpose" test was to ensure that all entities subjected to the burdens of political committee designation were engaged primarily in regulable, election-related speech. By diluting *Buckley*'s test and regulating entities that have the opposition or support of political candidates as merely "*a* major purpose," North Carolina runs the risk of burdening a substantial amount of constitutionally protected political speech. A single organization can have multiple "major purposes," and imposing political committee burdens on a multi-faceted organization may mean that North Carolina is regulating a relatively large amount of constitutionally protected speech unrelated to elections merely to regulate a relatively small amount of election-related speech.

The problems presented by § 163-278.6(14)'s sweep into constitutionally protected political speech are compounded by the statute's vagueness. While "*the* major purpose" of an organization may be open to interpretation, it provides potentially regulated entities with sufficient direction to determine if they will be designated as a political committee. Basically, if an organization explicitly states, in its by-laws or elsewhere, that influencing elections is its primary objective, or if the organization spends the majority of its money on supporting or opposing candidates, that organization is under "fair warning" that it may fall within the ambit of *Buckley*'s test.[6]

Conversely, § 163-278.6(14) provides absolutely no direction as to how North Carolina determines an organization's "major purposes." In addition to influencing elections, NCRL has many other objectives: it disseminates information on pro-life issues; it "work[s] for pro-life alternatives to abortion and humane solutions to the problems of women who seek abortions;" it "foster[s] and encourage[s] public

---

[6]The plaintiffs ask us to adopt a bright-line standard for determining whether "*the* major purpose" of an organization is the support or opposition of candidates. They argue that an entity should only fall within the ambit of "*the* major purpose" test if (1) the organic documents of the organization list electoral advocacy as the organization's major purpose or (2) if the organization spends over 50% of its money on influencing elections. *See Appellant Brief* at 31-32. While this standard would be constitutional, we need not determine in this case whether it is the only manner in which North Carolina can apply the teachings of *Buckley*.

health programs;" it "assist[s] in the establishment of a comprehensive medical, social, and recreational care program for unwed mothers;" and, finally, it "promote[s] anti-poverty programs . . . directed toward the family unit." JA 34 (quoting NCRL Articles of Incorporation).

In this sort of setting, it becomes difficult to understand when the "purpose" of supporting or opposing a candidate becomes "a major purpose." Is a purpose "major" if an organization has only one or two other purposes? Is there a share of total expenditures that determines when a purpose is "major"? An absolute dollar amount? Or perhaps frequency of participation is the relevant criteria: maybe if an organization engages in electoral advocacy three times during one election cycle then the support or opposition of a candidate is "a major purpose"? Given the vagueness of § 163-278.6(14)'s test, it is hard to argue with the plaintiff's contention that, in designating organizations as political committees, North Carolina is essentially handing out speeding tickets without "telling anyone . . . the speed limit." *Appellant Reply Brief* at 22.

Furthermore, if a board of regulators is to decide when a purpose becomes "a major purpose," especially on the basis of unannounced criteria, this leaves the application of § 163-278.6(14) open to the risk of partisan or ideological abuse. This is nowhere so dangerous as when protected political speech is involved. Section 163-278.6(14)'s "we'll know it when we see it approach" simply does not provide sufficient direction to either regulators or potentially regulated entities. Unguided regulatory discretion and the potential for regulatory abuse are the very burdens to which political speech must never be subject.

In fact, North Carolina's vague definition may create the perverse situation where an entity such as NCRL would have to go through the costly and time-consuming process of disclosing the very information it is attempting to protect in order to fight off a complaint that it is regulable as a political committee. When faced with such a choice, who could blame an organization for deciding not to exercise its right to engage in political speech?

Moreover, narrower means exist for North Carolina to achieve its regulatory objectives. North Carolina is surely right to think that orga-

nizations — particularly large organizations — can have a substantial impact on the electoral process even if influencing elections is merely one of their many "major purposes." When faced with such organizations, however, North Carolina does not have to impose the substantial burdens of political committee designation to achieve its goal of preventing corruption. Instead, North Carolina could impose one-time reporting requirements — as it already does on certain individual expenditures and contributions by non-political committee organizations, *see* N.C. Gen. Stat. § 163-278.12 — based on the communication, not the organization. In doing so, North Carolina would produce the same benefits of transparency and accountability while only imposing regulatory burdens on communications that are "unambiguously campaign related." *See Buckley*, 424 U.S. at 80.

It is thus clear that North Carolina's definition of political committee, § 163-278.6(14), is overbroad and vague. Not only does the statute threaten to regulate organizations primarily engaging in protected political speech, but it also magnifies its overbreadth by providing insufficient direction to speakers and leaving regulators free to operate without even the guidance of discernable, neutral criteria. Furthermore, narrower means exist for North Carolina to achieve its regulatory goals. We therefore hold § 163-278.6(14) to be facially unconstitutional.

IV.

Finally, we consider whether North Carolina can constitutionally apply a $4,000 contribution limit to independent expenditure committees such as NCRL-FIPE.

A.

Section 163-278.13 of North Carolina's General Statutes places a $4,000 limit on the amount any "individual, political committee, or other entity" can "contribute to any candidate or other political committee" in any given election cycle. N.C. Gen. Stat. § 163-278.13 (2007). In addition, the statute also prohibits all "candidate[s] and political committee[s]" from "accept[ing] or solicit[ing] any contribution[s]" over $4,000 in any given election cycle from "any individual, other political committee, or other entity." *Id.* As the text of the stat-

ute indicates, these $4,000 contribution limits apply to *all* political committees.

In this case, the plaintiffs challenge § 163-278.13 as applied to political committees, such as NCRL-FIPE, that only make independent expenditures. As stated earlier, independent expenditures are defined as those political expenditures "made without consultation or coordination with a candidate or agent of a candidate whose nomination or election the expenditure supports or whose opponent's nomination or election the expenditure opposes." *Id.* § 163-278.6(9a). The plaintiffs argue that North Carolina's interest in preventing corruption or the appearance of corruption is insufficient to support such a limit on contributions to committees that only make independent expenditures. This is because "the corruptive influence of contributions for independent expenditures is more novel and implausible than that posed by contributions to candidates." *NCRL II*, 344 F.3d at 434.

B.

Again, our analysis starts with the Supreme Court's decision in *Buckley v. Valeo*. In *Buckley*, the Court established what has become one of the foundational principles of its campaign finance jurisprudence: a state may limit campaign contributions if the limits are "closely drawn" and the state demonstrates that the limits support its interest in preventing corruption and the appearance thereof. *Buckley*, 424 U.S. at 24-29. In the thirty years since *Buckley*, the Court has consistently affirmed this principle, *see, e.g.*, *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377 (2000), including most recently in *Randall v. Sorrell*, 126 S. Ct. 2479, 2491-92 (2006).

Unsurprisingly, the strength of the state's interest in preventing corruption is highly correlated to the nature of the contribution's recipient. Thus, the state's interest in the prevention of corruption — and, therefore, its power to impose contribution limits — is strongest when the state limits contributions made directly to political candidates. Direct contributions to political candidates run the greatest risk of making candidates "too compliant with the wishes of large" donors, *Shrink Missouri*, 528 U.S. at 389, providing those donors with "undue influence" over the candidate's political decisionmaking, *NCRL II*, 344 F.3d at 433. Given this, the Court has consistently

allowed states to apply limits to direct candidate contributions. *See, e.g.*, *Shrink Missouri* 528 U.S. at 397-98; *Buckley*, 424 U.S. at 29.

As one moves away from the case in which a donor gives money directly to a candidate, however, the state's interest in preventing corruption necessarily decreases. This is because the danger that contributions will be given "as a *quid pro quo* for improper commitments from the candidate" is simply not as real when the candidate himself is removed from the process. *Buckley*, 424 U.S. at 47.

Of course, some organizations are so closely tied to candidates that the Court has deemed it constitutional for states to apply contribution limits to them. Otherwise, donors could "circumvent" valid contribution limits — and raise fears of corruption — by indirectly funneling money to candidates through political intermediaries. *See Fed. Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001) ("*Colorado Republican II*") (describing "circumvention" as a "valid theory of corruption"). Thus, the Court has held that it is constitutional for states to apply contribution limits to political committees that make contributions directly to candidates. *California Med. Ass'n v. Fed. Election Comm'n*, 453 U.S. 182 (1981) ("*Cal-Med*") (upholding the application of contribution limits to multi-candidate political committees, which accept money from donors and then make direct contributions to political candidates). Since these political committees are "essentially conduits for contributions to candidates," candidates would be able to easily evade contribution limits by routing large ticket donors to such committees. *Id.* at 203 (Blackmun, J., concurring).

The Court has further held that it is constitutional, in certain instances, to apply contribution limits to political parties. *See McConnell*, 540 U.S. at 144-45 (upholding the application of contribution limits to a federal candidate's national party and state and local party allies). While contributions made to political parties may not be passed through directly to candidates, the "special relationship and unity of interest" between political parties and candidates makes parties logical "'agents for spending on behalf of those who seek to produce obligated officeholders.'" *McConnell*, 540 U.S. at 145 (quoting *Colorado Republican II*, 533 U.S. at 452). In reaching this conclusion, the Court in *McConnell* highlighted the "ample record" demon-

strating both that political parties have embraced their role in facilitating the "widespread circumvention" of federal contribution limits and that "lobbyists, CEOs, and wealthy individuals alike have candidly admitted donating substantial sums" to "secur[e] influence over federal officials." *Id.* at 145-47.

Importantly, however, the Court has *never* held that it is constitutional to apply contribution limits to political committees that make solely independent expenditures. In fact, Justice Blackmun stressed in his *Cal-Med* concurrence that "contributions to a committee that makes only independent expenditures pose no . . . threat" of corruption or the appearance thereof. *See Cal-Med*, 453 U.S. at 203 (Blackmun, J., concurring). This makes perfect sense: independent expenditures are made without candidate consultation, rendering it unlikely that such expenditures would be made in exchange for "improper commitments from the candidate." *Buckley*, 424 U.S. at 47 (noting that "independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive").

Moreover, *McConnell* specifically emphasized the difference between political parties and independent expenditure political committees, which explains why contribution limits are acceptable when applied to the former, but unacceptable when applied to the latter. To begin, the Court noted that independent expenditure committees "do not select slates of candidates for elections," "determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses." *McConnell*, 540 U.S. at 188. Conversely, "[p]olitical parties have influence and power in the Legislature that vastly exceeds that of any interest group." *Id.* Furthermore, "party affiliation is the primary way . . . voters identify candidates," and therefore parties "have special access to and relationships with" those who hold public office. *Id.* It is thus not an exaggeration to say that *McConnell* views political parties as different in kind than independent expenditure committees.

Thus, while the state's power to impose contribution limits is well-established, that power exists only when the contribution limits are "closely drawn" to the state's interest in preventing corruption. As the state attempts to regulate entities further and further removed from the

candidate, the state interest in preventing corruption necessarily decreases. At the extreme, the entities furthest removed from the candidate are political committees that make solely independent expenditures. As such, it is "implausible" that contributions to independent expenditure political committees are corrupting. *NCRL II*, 344 F.3d at 434.

C.

In this case, we find that North Carolina has fallen short of demonstrating that application of its $4,000 contribution limit to independent expenditure political committees furthers its interest in preventing corruption. We thus declare § 163-278.13 unconstitutional as applied to NCRL-FIPE and all similarly situated entities.

Given the remove of independent expenditure committees from candidates themselves, we must require North Carolina to produce convincing evidence of corruption before upholding contribution limits as applied to such organizations. *Id.* (citing *Colorado Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 618 (1996)). Rather than producing convincing evidence, however, North Carolina puts largely the same evidence before this court as it did in *NCRL II*.[7] In that case, we held that the "state [has] failed to proffer

---

[7]North Carolina put forward, by way of new evidence, affidavits from Robert H. Hall and Thomas E. Mann, experts in campaign finance, and the draft chapter of a book on the influence of 527 Groups on elections. This new evidence largely supports arguments North Carolina made before this court in *NCRL II*: for example, that it is sometimes difficult for the State to distinguish independent from coordinated expenditures; that large donors may fund independent expenditure political committees; and that, at times, politicians react to the messages produced by independent expenditure political committees.

Importantly, however, North Carolina has failed to present the type of systematic and concrete evidence of corruption that led the Supreme Court to uphold contribution limits as applied to political parties in *McConnell*. Thus, North Carolina's evidence does not justify the remedy it seeks in this case: the ability to impose strict contribution limits on independent expenditure committees. The Supreme Court has not held such limits to be constitutional, and we will not do so here.

sufficiently convincing evidence" to demonstrate that there is a "danger of corruption due to the presence of unchecked contributions" to independent expenditure political committees.[8] *NCRL II*, 344 F.3d at 434.

We see no reason to change this determination. *McConnell* did expand the application of contribution limits to political parties, but, as discussed earlier, it also made clear that independent expenditures do not present a danger of corruption. *McConnell*, 540 U.S. at 221. In fact, *McConnell* emphasized that there is little "danger" that independent expenditures "will be given as a *quid pro quo* for improper commitments from [a] candidate." *Id.* (quoting *Buckley*, 424 U.S. at 47). Since the Supreme Court's views on the dangers of independent expenditures have not changed, North Carolina's evidence is still insufficient.

For example, a discussion of "Farmers for Fairness" is probably the primary piece of evidence discussed in North Carolina's briefing. *Appellee Brief* at 49-50; JA 313-16. North Carolina claims that the actions of "Farmers" "triggered widespread suspicion of corruption and damaged public confidence in the electoral process," as "legislators, regulators, the media, civic groups, [and] opinion leaders . . .

---

We need not ask if there will ever be a case in which North Carolina can present convincing evidence that contributions to independent expenditure committees are corruptive. Instead, we hold that the case for such limits was not made in *NCRL II*, nor was it made here.

[8]North Carolina also argues that NCRL-FIPE is not actually an independent expenditure committee because it is "closely intertwined" with NCRL and NCRL-PAC. *See Appellee Brief* at 37-43. However, while NCRL-FIPE does share staff and facilities with its sister and parent entities, it is independent as a matter of law. *See North Carolina Right to Life, Inc. v. Leake*, 482 F. Supp. 2d 686, 699 (E.D.N.C. 2007).

Thus, North Carolina is, in essence, asking us to pierce the corporate veil. We decline to do so, particularly absent any evidence that the plaintiffs are abusing their legal forms or "any legal authority that considers [political committees] and their sponsoring corporation as identical entities." *Id.*

were witnessing firsthand the awesome power of concentrated wealth when it enters the electoral arena." *Id.*

"Farmers for Fairness" is an independent expenditure committee that used substantial contributions from "a dozen hog producers and suppliers" to fund advertisements supporting hog industry interests. JA 313. In April 1998, "Farmers" spent over $10,000 a week on issue advocacy targeted at a state representative who had led efforts to increase regulation of the hog industry. *Id.* That representative was defeated in her primary election, and two of the three other legislators targeted by "Farmers for Fairness" were defeated in the general election. *Id.* The State also claims that "Farmers" showed legislative leaders their advertisements before they were broadcast, in order to demonstrate to the leaders "the group's seriousness about impacting the political process." *Id.* Finally, North Carolina presents evidence that "Farmers" "discussed" regulatory relief with political party principals, although "no clear *quid pro quo* could be established." JA 314.

This evidence does not constitute the type of convincing evidence required to uphold the application of contribution limits to independent expenditure committees. For one, the fact that "Farmers for Fairness" spent money that was successful in convincing voters to oust their targeted candidates can hardly be termed corruptive. This fact — alone — simply means that a group felt passionately about an issue and discussed it. After all, one of the primary purposes of political speech is to persuade the electorate. Perchance the message of "Farmers for Fairness" is very much misguided. Those who believe it so should make the case. For the way to counter speech is with opposing speech, not with laws designed to dampen and depress it.

For two, the fact that "Farmers" demonstrated their "seriousness about impacting the political process" is also not evidence of corruption. It goes without saying that it is not a sin to be serious about "impacting the political process" — in fact, the First Amendment is largely about providing every citizen with just that opportunity. If robust advocacy alone is sufficient to demonstrate corruption, the term corruption would cease to have meaning.

Finally, the evidence that "Farmers for Fairness" discussed its ads with legislative leaders does not constitute evidence that contributions

to independent expenditure committees are corruptive. If anything, this constitutes evidence that organizations that claim to be independent expenditure committees are, in fact, coordinating their expenditures with candidates. If independent expenditure committees are not in fact independent, they risk forfeiting their exemption from North Carolina's contribution limits. In such instances, North Carolina is free to apply in a constitutional manner its contribution limits against these purportedly "independent" expenditure committees.

The bottom line is this: independent expenditure political committees do not serve as mouthpieces for political candidates. In fact, such committees do not even coordinate their messages with candidates. Instead, independent expenditure political committees offer an opportunity for ordinary citizens to band together to speak on the issue or issues most important to them. In other words, they allow ordinary citizens to receive the benefits that result from economies of scale in trying to convince the electorate of a political message.

Of course, candidates may be influenced by the impact that such independent expenditures have on the electorate — but this is the entire purpose of allowing free political discourse. As the Supreme Court has said: "The fact that candidates and elected officials may alter or reaffirm their own positions on issues in response to political messages paid for by [political committees] can hardly be called corruption." *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 498 (1985).

In fact, we would go further. Candidates and elected officials altering their positions in response to a political debate is the very essence of democracy. Nothing could be further removed from the spirit of the First Amendment than labeling speech corruptive merely because it is effective. We thus hold § 163-278.13 unconstitutional as applied to independent expenditure political committees such as NCRL-FIPE.

## V.

Finally, we address our colleague's dissenting opinion. The dissent contends we broaden First Amendment protections beyond recognized boundaries in order to "severely restrict[ ] the well-established power of a state to regulate its elections." *Post* at 53. Our decision,

the dissent insists, will leave unchecked the "pernicious influence of too much money in politics," *id.* (internal quotations omitted), and thereby unleash a parade of horribles on the citizens of North Carolina. *See, e.g.*, *id.* at 54 (alleging that our decision will "allow many politically active organizations to escape regulation and hide their identities and activities from public scrutiny"); *id.* at 67 (arguing that our decision will result in "the invalidation of many election regulations that have been carefully drafted to honor and comply with First Amendment principles, as established by decades of Supreme Court precedent"); *id.* at 95 (stating that our decision will give organizations "an explicit green light . . . to circumvent campaign finance regulation").

All this, of course, is hyperbolic. We respect without question the state's legitimate interest in ensuring the integrity of the electoral process. To the extent the state regulates electoral advocacy within the scope of these interests it is well within constitutional bounds. By contrast, it is the dissent's position that sweeps broadly and portends dramatic consequences. The dissent fails to set forth any meaningful limits on the consignment of our most basic political speech to layer upon layer of intense regulation. One searches the dissent for some end to the reach of regulatory authority, but there is none. Instead, the dissent envisions an order in which the bureaucratic ministries of the state would have nearly unbridled discretion to allow or disallow political messages based, *inter alia*, on the regulator's own preferences and predilections.

This is not some marginal or incidental freedom with which the dissent is dealing. Rather it is the essential freedom that defines our ability — both individually and collectively — to speak in unfettered fashion on the most pressing issues of the day, and to express approval or disapproval of the functioning of our representative government. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), noted our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." The Court has long made clear that political speech is "indispensable to decisionmaking in a democracy," and that the courts play a critical role in its protection. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978).

For the regulator's hand, once loosed, is not easily leashed. The Code of Federal Regulations, or its state equivalent, is no small thing. It is no unfounded fear that one day the regulation of elections may resemble the Internal Revenue Code, and that impossible complexity may take root in the very area where freedom from intrusive governmental oversight should matter most. For while appropriate regulation may serve good and useful purposes in many areas, the Constitution makes clear that excessive regulation of political speech is suspect.

Campaign finance regulation has been termed "baffling and conflicted." *Majors v. Abell*, 361 F.3d 349, 355 (7th Cir. 2004). It is an area in which speakers are now increasingly forced to navigate a maze of rules, sub-rules, and cross-references in order to do nothing more than project a basic political message. Only those able to hire the best team of lawyers may one day be able to secure the advisory opinions, *see* N.C. Gen. Stat. § 163-278.23 (2007), or otherwise figure out the myriad relevant rulings with any degree of assurance that they will escape civil and criminal sanctions for their speech. *See, e.g.*, *id.* § 163-278.27 (imposing a Class 2 misdemeanor for violation of campaign finance laws); *id.* § 163-278.34 (imposing various civil penalties, including fines, for failure to comply with campaign finance laws). The Supreme Court has warned against exactly this. *See WRTL*, 127 S. Ct. at 2666 (citing *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).

North Carolina's regulations do not meet basic First Amendment requirements. Instead, they set out vague standards that empower administrators to burden core political expression (N.C. Gen. Stat. §§ 163-278.14A(a)(2) & 163-278.6(14)) and regulate beyond the periphery of any plausible state interest in preventing corruption (N.C. Gen. Stat. § 163-278.13). To uphold these regulations is to usher in a regime in which the winners are ungovernable complexity, the state enforcement apparatus, and the experts in the arcana of election law whose fees will increasingly make affluence a prerequisite for many forms of political participation. The losers, sadly, will be persons of all points of view who wish only to engage in robust political discussion.

## A.

The dissent initially contends that we err by invalidating North Carolina's "context prong" for identifying speech that "support[s] or

oppose[s] the nomination or election of one or more clearly identified candidates." *See* N.C. Gen. Stat. § 163-278.14A(a)(2) (2007). In particular, the dissent alleges that we have declared a statute overbroad when it would unconstitutionally regulate pure political speech only in "rare instances," and vague when it provides "particularly clear direction to both speakers and regulators." *Post* at 80, 67.

1.

The dissent commits several errors in evaluating the constitutionality of § 163-278.14A(a)(2). To begin, the dissent virtually ignores the import of *FEC v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652 (2007), the Supreme Court's most recent decision addressing the issues in this case. In fact, the dissent goes so far as to suggest that *WRTL* has no "relevan[ce]" or meaning for major areas of campaign finance law. *See post* at 78.

I find this dismissiveness unfortunate. To say that *WRTL* is "not relevant" outside the realm of expenditure requirements, *see id.*, is to say that other campaign finance regulations — however vague and overbroad — pose no danger to political speech. Given its plain application and unquestioned relevance, it is simply wrong for the dissent to give *WRTL* such short shrift. Indeed, the dissent fails even to recognize that *WRTL* sought to limit and confine the definition of the "functional equivalent of express advocacy" in order to prevent state regulation from vitiating political speech. *See id.* at 62-63.

Specifically, *WRTL* only allows political speech to be regulated if it *both* "meets the brightline requirements of BCRA § 203" and "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *See WRTL*, 127 S. Ct. at 2669 n.7, 2667. The dissent never claims that § 163-278.14A(a)(2) meets this standard, nor can it: as discussed earlier, North Carolina's "context prong" sweeps far more broadly than *WRTL*'s "functional equivalent of express advocacy" test. *See supra* at 12-15.

The "context prong," as noted, is intended to regulate "communications whose essential nature expresses electoral advocacy." Section 163-278.14A(a)(2) resorts to "contextual factors" to identify a communication's "essential nature" when and "[i]f *the course of action is*

*unclear*." N.C. Gen. Stat. § 163-278.14A(a)(2) (2007) (emphasis added). This last is nothing short of an explicit confession from the statute itself of its fatal vagueness and overbreadth. Despite the fact that "the benefit of the doubt" must be given to speech, rather than censorship, *see WRTL*, 127 S. Ct. at 2674, North Carolina's "context prong," when faced with uncertainty, subjects speech to *more* scrutiny and possible regulation. This is patently unconstitutional: "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor." *Id.* at 2669.

Furthermore, North Carolina simply compounds the constitutional infirmities by using "contextual factors" in a misguided attempt to bring clarity to § 163-278.14A(a)(2)'s quixotic search for a communication's "essential nature." As stated earlier, *WRTL* expressly rejects the constitutionality of the "'open-ended rough-and-tumble of factors'" as a means of identifying regulable electoral advocacy or its functional equivalent, since such factors invariably burden speech by "'invit[ing] complex argument in a trial court and a virtually inevitable appeal.'" *WRTL* 127 S. Ct. at 2666 (quoting *Jerome B. Grubart*, 513 U.S. at 547). In other words, *WRTL* emphatically rejects the resort to a multi-factored, totality of the circumstances approach for defining regulable electoral advocacy. In stark contrast, North Carolina has explicitly adopted just such a test. This is squarely at odds with the clear direction offered by the Supreme Court, and as a lower court we are bound to follow the Court's instructions. Doing otherwise will set both the inferior federal courts and the states themselves on a dangerous path.

The dissent claims that we "simply misread[ ] *WRTL*" in forbidding the use of factors, since nothing in *WRTL* forbids "the consideration of context." *Post* at 73-74. But it is the dissent that misreads *WRTL*. The problem with § 163-278.14A(a)(2)'s use of "contextual factors" is not the consideration of context (which is, indeed, inevitable in such an objective inquiry), but rather the use of factors. As discussed earlier, *see supra* at 13, the "contextual factors" listed in § 163-278.14A(a)(2) are nothing if not a lexicon of bureaucratic empowerment, and an invitation to endless litigation during which the speaker is left at sea.

In order to demonstrate this, it bears repeating the "contextual factors" referenced in the statute: "the language of the communication as

a whole, the timing of the communication in relation to the events of the day, the distribution of the communication to a significant number of registered voters for that candidate's election, and the cost of the communication." N.C. Gen. Stat. § 163-278.14A(a)(2) (2007). Nebulous terms do not "assist[ ]" regulators by providing "direction" as the dissent suggests, *see post* at 69; they further muddy the waters. North Carolina's loose mélange of factors do not elucidate *WRTL*'s objective test; instead, they present the very infirmity identified by *WRTL*, namely, that of supplying regulators with nearly endless possibilities for discovering whether a communication can "only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election." N.C. Gen. Stat. § 163-278.14A(a)(2) (2007). Consider, for example: what are the significant "events of the day"? How many days are sufficient for a communication to escape being "relat[ed]" by "timing" to the "events of the day"? What is a "significant number" of voters? The "context prong" provides no answers to these or other questions, and instead threatens to regulate large quantities of pure political speech.

The dissent contends that we incorrectly use the "brightline requirements of BCRA § 203" as a "rigid" test for overbreadth. *Post* at 64-65. To the contrary, we use the BCRA definition to illustrate just how incredibly far the contextual definition in this case has broadened the scope of electoral advocacy from what was approved in *McConnell*. Indeed, BCRA § 203 only regulates communications that refer to specific individuals ("clearly identified candidates") at specific times (thirty days before a primary and sixty days before a general election) and reach at least a specific number of people (50,000 in the district or state the candidate seeks to represent). By contrast, § 163-278.14A(a)(2) determines whether communications are regulable by divining their "essential nature" (which the statute itself admits is "unclear") from a set of vague and undefined "contextual factors." *Compare* BCRA, 116 Stat. 91, 2 U.S.C. § 434(f)(3)(A)(i), (C) (2000 ed. & Supp. IV) *with* N.C. Gen. Stat. § 163-278.14A(a)(2) (2007). The two approaches are different in kind, and the latter, therefore, is hardly a suitable substitute for the former as a means to identify the "functional equivalent of express advocacy."

And even if the dissent is correct and *WRTL* did not intend to mandate the specific dictates of BCRA § 203 as a necessary prerequisite

for functional equivalency, it is inconceivable that the Supreme Court would ever allow a state to substitute a test as vague and broad as this "context prong" as an alternative standard. For even a cursory reading of § 163-278.14A(a)(2) uncovers its serious constitutional infirmities — infirmities the dissent has failed to acknowledge, much less address.

In fact, the dissent is unable to identify a single case that has upheld a definition of the "functional equivalent of express advocacy" as broad as § 163-278.14A(a)(2) since the Supreme Court's *WRTL* decision. Instead, the dissent points to three cases that specifically address BCRA, *see Citizens United v. Fed. Election Comm'n*, 530 F. Supp. 2d 274, 276-77 (D.D.C. 2008); *Shays v. Fed. Election Comm'n*, 508 F. Supp. 2d 10 (D.D.C. 2007); *Fed. Election Comm'n v. Kalogianis*, No. 8:06-cv-68-T-23EAJ, 2007 WL 4247795 (M.D. Fla. Nov. 30, 2007), and two cases that address statutes containing none of the infirmities discussed above, *see Cal. Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1180-83 (9th Cir. 2007); *Voters Educ. Comm. v. Wash. State Public Disclosure Comm'n*, 166 P.3d 1174, 1180 (Wash. 2007). None of these cases contains a definition of regulable electoral advocacy that is remotely as overbroad and indeterminate as the enactment before us.

Indeed, the dissent does not quote from any of the statutes at issue in any of those cases for a very good reason: most follow BCRA, and all avoid such phrases as "if the course of action is unclear," "the timing of the communication in relation to the events of the day," and "the distribution of the communication to a significant number of registered voters." It is thus plain that § 163-278.14A(a)(2) does not provide a constitutionally adequate test for express advocacy or its functional equivalent, and is thus substantially vague and overbroad.

Moreover, despite the dissent's arguments to the contrary, the fact that "a potential speaker may seek further guidance" in the form of "a binding advisory opinion," does not fix § 163-278.14A(a)(2)'s multiple constitutional infirmities. *Post* at 70. If states were able to address a statute's breadth and lack of clarity simply by adding another layer to their regulatory apparatus, the overbreadth and void for vagueness doctrines would be a dead letter. Simply put, the ability to engage in

political speech cannot be made into a matter of repetitive supplication.

Despite this, the dissent accuses us of failing to perform a "proper overbreadth analysis" that takes into account the various "type[s] of regulations implicated" by § 163-278.14A(a)(2). *Id.* at 65, 74-78. According to the dissent, the burdens imposed on political speech and the state's interests may vary by the type of regulation, and, therefore, analyzing § 163-278.14A(a)(2) regulation by regulation demonstrates that it is only unconstitutional in "rare" applications, and thus not facially overbroad. *Id.* at 79-80. The dissent would thus have us uphold § 163-278.14A(a)(2) in full and wait to consider the constitutionality of each of its applications in an as-applied fashion.

Even if the dissent were correct that the scope of regulable speech may vary slightly based on regulation type, this does not mean that a patently overbroad definition like § 163-278.14A(a)(2) acquires a halo of constitutionality when the context shifts. Speakers are going to have to contend with this same definition and its same infirmities for both expenditures and contributions, regardless of whether the regulatory context is one of disclosure, reporting, or limitation. There is simply no reason to subject speakers to such an imposition when a statute explicitly announces that its own "unclear" definition threatens the regulation of protected speech, and when other overbroad "contextual factors" doubly and triply compound the problem.

If we decided to proceed incrementally in an as-applied fashion, as the dissent suggests, it would require protracted litigation to sort through all of the "context prong's" uncertain and problematic applications. During this time, speech would be at the leave of bureaucratic discretion and potentially subject to bewildering and inconsistent rulings and decisions: the very blueprint for chilling political discussion. Speakers must not be put in "'circumstances wholly at the mercy of the varied understanding of [their] hearers,'" in this case regulators hypothesizing about some hypothetical audience. *Buckley*, 424 U.S. at 43 (quoting *Thomas v. Collins*, 323 U.S. 516, 535 (1945)). Faced with such prospects, many speakers, "rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech — harming not only themselves but society as a

whole, which is deprived of an uninhibited marketplace of ideas." *Hicks*, 539 U.S. at 119 (citing *Dombrowski v. Pfister*, 380 U.S. 479, 486-87 (1965)).

The dissent argues that the Supreme Court's recent decision in *Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184 (2008), offers more proof that facial challenges are disfavored in the First Amendment context. *See post* at 58, 100, 101. *Washington State Grange*, of course, is about primary design and access, not the financing of political campaigns. *See* 128 S. Ct. at 1187-89. It involves a different set of constitutional interests: the associational rights of political parties, rather than the individual right to the freedom of political speech. *See id.* at 1189-90. In fact, *Washington State Grange* does not so much as reference *Buckley*, *McConnell* or *WRTL* (or for that matter any other campaign finance case) even once. If the Supreme Court wanted to establish a sweeping new approach to evaluating campaign finance cases in *Washington State Grange*, it would at the very least have alluded to its own decisional law.

Moreover, the Court took pains to except the situation before us in this case — a challenge to a statute's overbreadth and vagueness — from its holding in *Washington State Grange*. Recognizing the different constitutional interests at stake in an overbreadth challenge, the Court in *Washington State Grange* held that a challenge to a statute's overbreadth was a "second type of facial challenge" different than the one presented in *Grange*. *See Grange*, 128 S. Ct. at 1190 n.6. The Court then stated that the facial standard for overbreadth ("a substantial number of [a statute's] applications are unconstitutional") is less onerous than the facial standard applied in *Grange* ("a plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the Act would be valid"). *Id.* at 1190 & n.6 (internal quotations omitted). In fact, the Court in *Washington State Grange* used the exact same "strong medicine" language we do in describing the appropriate standard for facial overbreadth challenges. *See id.* at 1190 n.6 (internal quotations omitted).

To understand substantial overbreadth in this area, we need look no further than the Supreme Court's own decisions. As noted, the Court has made clear that, in order to avoid overbreadth concerns, campaign

finance statutes must *both* conform to BCRA § 203 and avoid the "rough-and-tumble" of multi-factored tests. *See WRTL*, 127 S. Ct. at 2666, 2669 n.7. North Carolina's "context prong" does *neither*. It is thus unconstitutional. We hardly need speculate, as the dissent terms it, on the overbroad applications of N.C. Gen. Stat. § 163-278.14A(a)(2). *See post* at 100 (quoting *Grange*, 128 S. Ct. at 1190). The statute is substantially overbroad under the Supreme Court's own explicit terms.

Thus, while we recognize that *WRTL* involved an as-applied challenge, that does not mean that the entire holding and reasoning of that decision is without any facial implications. The Constitution does not require that we go application by application, case by case, month by month, year after year to eradicate the very infirmities the Supreme Court warned against and insisted we avoid.

2.

To conclude, we address the dissent's concern that our decision invalidates "many election regulations," allowing "organizations and individuals to conceal their identities, spend unlimited amounts on campaign advertising masked as discussion of issues, and 'hide themselves from the scrutiny of the voting public.'" *Post* at 67, 53 (quoting *McConnell*, 540 U.S. at 197).

The dissent's concerns are overblown. While we do indeed invalidate N.C. Gen. Stat. § 163-278.14A(a)(2) as impermissibly vague and substantially overbroad, North Carolina remains free to enforce all campaign finance regulations that incorporate the phrase "to support or oppose the nomination or election of one or more clearly identified candidates." *See* N.C. Gen. Stat. § 163-278.14A(a) (2007). And, while the dissent apparently contends that our decision makes it impossible for North Carolina to draft a constitutional context prong, *see post* at 69-70, North Carolina remains free to adopt a definition of express advocacy consistent with the standards approved by *McConnell* and *WRTL*. Furthermore, we leave the core of the state's regulatory power in this area untouched: for example, the state is still free to regulate contributions to political campaigns, and to impose reporting and disclosure requirements on political campaigns and other entities historically considered to be political committees. We simply hold that

North Carolina cannot rely on the overbroad and vague "context prong."

North Carolina has tasked its State Board of Elections with broad responsibilities and granted it far-reaching powers to achieve its goals. The State Board is directed to investigate any potential violation of North Carolina's election laws. *See* N.C. Gen. Stat. § 163-22(d) (2007). In order to perform these investigations, the chairman of the Board has the "power to administer oaths, issue subpoenas, summon witnesses, and compel the production of papers, books, records and other evidence." *Id.* § 163-23. And if the Board has "reason to believe there has been a violation" of North Carolina's campaign finance laws, it can direct "the appropriate district attorney" to "prosecute the individuals or persons alleged to have violated" North Carolina's election laws. *Id.* § 163-278.27.

The danger in this area — when dealing with a broadly empowered bureaucracy — is not that speakers may disguise electoral messages as issue advocacy, but rather that simple issue advocacy will be suppressed by some regulator who fears it may bear conceivably on some campaign. If the First Amendment protects anything, it is the right of political speakers to express their beliefs without having to fear subsequent civil and criminal reprisals from regulators authorized to employ broad and vague definitions as they see fit. *See Buckley*, 424 U.S. at 43 (quoting *Thomas*, 323 U.S. at 535).

Of course, the dissent is right to point out that our decision may enable speakers to more easily influence elections using issue advocacy. *See post* at 53. But that is no affront to democracy. In fact, the only way to stop political speech from ever influencing the outcome of elections would be to ban it entirely. For, as the Supreme Court has just noted, the very purpose of political speech is to provide people with "information" about important issues so that they can make informed "voting decisions." *See WRTL*, 127 S. Ct. at 2667; *see also Thornhill v. Alabama*, 310 U.S. 88, 101-02 (1940).

The answer to avoidance of political speech restrictions is not invariably more political speech restrictions, or an increase in the breadth, depth, and complexity of the state's regulatory apparatus. There is no end in sight to that approach, nor does the dissent so much

as suggest one. At some point — a point reached far before the substantial and unprecedented overbreadth of § 163-278.14A(a)(2) — enough is simply enough. *See WRTL*, 127 S. Ct. at 2672.

## B.

The dissent next takes issue with our analysis of North Carolina's political committee definition. Under North Carolina law, four types of entities can be labeled political committees: candidate-controlled committees; political parties or their affiliates; corporations or other business and professional groups, including unions; and, finally, any entity that "[h]as as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates." N.C. Gen. Stat. § 163-278.6(14) (2007). Only the last of these entities is in any way at issue. The dissent contends that we err in holding this last portion of the political committee definition — the "*a* major purpose" test — unconstitutionally vague and overbroad. *See post* at 80-82.

As an initial matter, the dissent would have us decline to follow the very language used not only by *Buckley v. Valeo*, but also by numerous other cases as well. *See supra* at 18-20. But, just as we observed with respect to the treatment of *WRTL*, declining to follow the Supreme Court is not an option. *Buckley* explicitly states that political committee regulations "can cover groups 'the major purpose of which is the nomination or election of a candidate.'" *Post* at 81 (quoting *Buckley*, 424 U.S. at 79) (emphasis omitted). If this is *Buckley*'s formulation, then it must be ours, and the question is why it is not the dissent's as well.

Despite *Buckley*'s clear mandate, the dissent argues that North Carolina is not required to "rigidly adhere" to "*the* major purpose" test. *Post* at 80. According to the dissent, North Carolina's "a major purpose" standard is sufficiently clear to provide direction to political speakers, *see id.* at 82-84, and "careful not to frustrate issue advocacy or general political speech," *id.* at 88.

This view fails to appreciate the difference between the definite and indefinite articles in this context. The dissent contends that "North Carolina's 'a major purpose' test is just as clear as a 'the major purpose' test to both speakers and regulators." *Id.* at 84. Like-

wise, the dissent contends that "the substitution of 'a' for 'the' in *Buckley*'s major purpose test does not expand the reach of the Act in any way that overly burdens First Amendment freedoms." *Id.* With these arguments, however, the dissent simply ignores the fact that, under North Carolina's "a major purpose" approach, an organization can have *multiple* "major purposes," while under the Supreme Court's "the major purpose" approach, an organization can have but *one* "major purpose." The constitutional importance of this distinction is self-evident.

To begin, although there may be disputes in rare circumstances, organizations and regulators should agree on an organization's foremost or "primary" purpose. *MCFL*, 479 U.S. at 262. Conversely, North Carolina's "a major purpose" standard leaves the "line between innocent and condemned conduct . . . a matter of guesswork." Laurence H. Tribe, *American Constitutional Law* § 12-31, at 1033 (2d ed. 1988). This is particularly true because North Carolina provides absolutely no statutory direction as to when a "purpose" becomes "a major purpose" in a multi-faceted organization like NCRL. *See supra* at 23. Is it based on the number of purposes? The money spent on each? The frequency of electoral participation? The statute does not provide notice as to which of these standards apply; this, of course, means that regulators will once again be empowered to make these judgments to the maximum conceivable extent.

Moreover, under North Carolina's "a major purpose" standard, organizations can be subjected to regulation as a political committee even if the majority of their activity is not election related. Since political committee burdens apply across the board to *all* of an organization's activities, this means that, under § 163-278.6(14), substantial amounts of pure political speech will be burdened in an effort to regulate relatively minor amounts of electoral advocacy. The dissent is well aware of this. In fact, it readily admits that "most organizations — including NCRL — do not have just one major purpose." *Post* at 86. But the dissent thinks North Carolina's "a major purpose" standard is appropriate regardless, since it enables the regulation of organizations "heavily focused on electoral advocacy" — that is, organizations that spend "forty-five percent of [their] resources on lobbying and forty-five percent of [their] resources on supporting or opposing specific candidates." *Id.*

Of course, the dissent's stylized example does not address the organization that has four equally important purposes, only one of which is electoral advocacy. Nor does it consider the organization that has seven equally important purposes. Or ten. But under North Carolina's "a major purpose" standard, each of these organizations could be subjected to regulation just as surely as the dissent's hypothetical example. The dissent simply never addresses the plain fact that performing our duty to follow *Buckley*'s "the major purpose" standard is the only way to ensure that political committee burdens fall primarily on electoral advocacy. *See supra* at 21-22.

The dissent also underestimates the burdens attendant to designation as a political committee. The dissent claims that North Carolina's political committee requirements "impose only marginal restrictions on speech." *Post* at 85. This belies both the precedent of this circuit — which has termed "the consequences" of being labeled a political committee "substantial," *NCRL I*, 168 F.3d at 712 — and the actual nature of the obligations. We have detailed earlier in this opinion the welter of regulations placed on political committees under North Carolina law. *See supra* at 25-26. Political committees must, *inter alia*, appoint a treasurer to be trained by the State before every election cycle, *see* N.C. Gen. Stat. § 163-278.7 (2007), abide by contribution limits, *see id.* §§ 163-278.13, and comply with time-consuming disclosure requirements that allow the state to scrutinize their affairs, *see, e.g.*, *id.* §§ 163-278.9. These requirements are more than just nuisances, and indeed are precisely the sort of burden that discourages potential speakers from engaging in political debate. *See Buckley*, 424 U.S. at 64-65.

Finally, the dissent is too quick to discount the possibility that North Carolina can achieve its regulatory objectives through less restrictive means. The dissent does not contest the fact that one-time reporting requirements of contributions and expenditures will produce many of the same benefits of accountability and transparency as the more onerous political committee designation. Nonetheless, the dissent still finds this less burdensome alternative too "tepid" and "minimalist." *Post* at 87. This is because one-time requirements do not "enable the state" to either "undertake prompt investigation of incidents of potential misconduct" or "limit[ ] extremely large contribu-

tions to organizations that then spend that money on direct electoral advocacy." *Id.* at 134-35.

Neither of the dissent's concerns carry the day, however. The mere possibility that an organization may "potentially" engage in misconduct is not a sufficient reason to regulate large quantities of political expression. Hypothetical harms do not justify infringement on First Amendment freedoms. *See, e.g.*, *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). Likewise, the dissent does not recognize that "large contributions" given to organizations with only "*a* major purpose" of influencing elections will more likely than not be used to fund protected First Amendment activities. This is hardly the sort of tailoring required in this most sensitive of areas. *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

The dissent's analysis of North Carolina's political committee definition thus mirrors its analysis of the "context prong." Dissatisfied with regulatory options that conform to clear Supreme Court precedent, the dissent writes North Carolina what is, in essence, a blank check to trample on protected political speech.

## C.

The dissent finally contends that we err by striking "down [North Carolina's] $4,000 contribution limit insofar as it applies to 'independent expenditure political committees' such as NCRL-FIPE." *Post* at 88. The dissent claims that we "improperly" discount the "substantial evidence of the corruptive influence of independent expenditures" that North Carolina has produced. *Id.* at 96. According to the dissent, this evidence is "sufficient" to justify the application of § 163-278.13 to independent expenditure committees. *Id.* at 92.

The specific evidence discussed by the dissent, however, does not constitute the type of proof necessary to warrant the regulation of pure political expression. In particular, the dissent discusses three pieces of evidence: (1) an expert declaration concerning how, in the 2004 federal campaigns, national parties routed large-ticket donors toward independent expenditure committees that were able to "'effectively aid a campaign without any formal coordination,'" *id.* at 92 (quoting JA 325); (2) the previously discussed Farmers for Fairness

advertising campaign "directly opposing certain legislative candidates," *post* at 93; and, finally, (3) general evidence of "actual corruption in North Carolina politics," *id.* at 94 n.11.

This evidence does not support the conclusion that independent expenditure committees are corrupting North Carolina politics. The only evidence the dissent presents on the actual use of independent expenditure committees to circumvent contribution limits involves national parties and federal elections. Indeed, the dissent presents no evidence specific to North Carolina linking either the systematic circumvention of contribution limits or *quid pro quo* corruption to independent expenditure committees.

In fact, it is worth pausing on the evidence the dissent does present concerning North Carolina politics in order to demonstrate its insufficiency. Although the dissent discusses a single independent expenditure committee, Farmers for Fairness, at length, the dissent never once even alleges that the Farmers coordinated their expenditures with candidates or engaged in traditional *quid pro quo* corruption. Instead, the dissent finds it sufficient that the Farmers proposed to run ads that took issue with incumbent legislators on positions "unrelated" to "its central issue, deregulation of the hog industry." *Id.* at 93.

It is difficult to see how these facts support the regulation of independent expenditure committees. The fact that such committees may find it worthwhile to support issues other than their primary focus hardly constitutes corruption or even the appearance thereof. Likewise, we see no harm in using pure political speech in an attempt to achieve legislative ends.

Our disagreement with the dissent on this latter point is fundamental. The dissent's vague assertion of intimidation simply does not support the regulation of pure political speech. Political speakers have every right to make incumbents answer for their record. Legislators are not without their bully pulpit, and incumbents are not without their fundraising and name-recognition advantages. It is virtually unassailable that political speech is as necessary for political challengers as for sitting legislators, and the dissent simply pays no heed to the fact that the regulation of political speech can very easily serve as a front for incumbency protection. *See Randall v. Sorrell*, 126 S.

Ct. 2479, 2492-94 (2006). "The first instinct of power is the retention of power, and, under a Constitution that requires periodic elections, that is best achieved by the suppression of election-time speech." *McConnell*, 540 U.S. at 263 (Scalia, J., dissenting). The appropriate legislative response to potentially effective speech from organizations like the Farmers for Fairness is not to silence them through regulation, but rather to appeal to the electorate with effective counter-speech. *See Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) (stating that the appropriate "remedy to be applied" to objectionable speech "is more speech, not enforced silence").

The dissent's other evidence specific to North Carolina consists of "examples of actual corruption in North Carolina politics." *Post* at 94 n.11. According to the dissent, the fact that politicians in North Carolina have engaged in corruption "support[s] the state's reasonable prediction that state politicians and contributors will likely find and exploit any existing loopholes in campaign finance regulations." *Id.* This evidence is similarly unpersuasive: general evidence of corruption hardly justifies the specific regulation of independent expenditure committees.  In fact, some may argue that free political speech is the best remedy for, rather than a cause of, corruption. Indeed, independent expenditure committees may be the very ones to take up the lance against corrupt public practices. By embracing ever greater burdens upon political speech, the dissent is slowly ridding our democracy of one of its foremost cleansing agents. *See, e.g.*, *Mills v. Alabama*, 384 U.S. 214, 218 (1966) (noting that "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs").

Finally, we address the dissent's final argument: that the corporate structure of NCRL, NCRL-PAC, and NCRL-FIPE justifies application of North Carolina's contribution limits to independent expenditure committees. According to the dissent, our decision allows interlocked organizations that share management (like NCRL and its affiliates) to "circumvent campaign finance regulation" by coordinating with candidates through political committees (e.g., NCRL-PAC), while accepting large-ticket donations to independent expenditure committees (e.g., NCRL-FIPE). *Post* at 95.

While we recognize the theoretical risk of abuse in this area, the dissent's argument is at least two steps away from justifying across-

the-board application of contribution limits to independent expenditure committees. First, as discussed earlier, there is no evidence in the record that NCRL has abused its corporate form. *See supra* at 29 n.8. Second, even if there was evidence that NCRL was using NCRL-FIPE to circumvent North Carolina's contribution limits, this would hardly be sufficient justification to regulate *all* independent expenditure committees. Such committees would be judged guilty with no chance of proving their innocence, while the state neglected the use of a more narrowly tailored regulatory option: applying contribution limits to independent expenditure committees shown to have abused their corporate form.

D.

Our colleague in dissent charges that "[i]t is not our place to rewrite precedent, even if our beliefs about the First Amendment conflict with those of the Supreme Court." *See post* at 100. Surely this suggestion must have occasioned introspection. For it is the dissent which has contravened no fewer than three Supreme Court precedents in a single action. It seeks to uphold the very multi-factor test that *WRTL* said emphatically should not be upheld. It seeks to sustain a statute unprecedented in its lack of clarity against a vagueness challenge, even though the statute extends far beyond the specific set of requirements the Supreme Court approved in *McConnell*. And, finally, the dissent rejects the exact formulation used by *Buckley* and its progeny to define political committee in a manner that infringes least substantially on political speech. While it is assuredly true that courts of appeal enjoy interstitial latitude in interpreting Supreme Court decisions, we do not possess the authority to set them aside. That is the plain effect of what is urged by the dissent, and it would only add to the problems and uncertainties besetting this area.

The dissent further disregards Supreme Court precedent by inventing a First Amendment standard out of whole cloth. The dissent concedes that North Carolina's regulations "may affect speech," but refuses to declare the statutes unconstitutional because they "do not silence" speech. *Post* at 98; *see also id.* at 97. This "silencing" standard is no friend of the First Amendment. Indeed, the dissent's surmise about the quantum of political speech lost to North Carolina's overbroad campaign finance regulations is nothing more than guess-

work. With its new "silencing" standard, the dissent suggests that political speech must be placed in some meat locker before First Amendment implications arise. This is not how we understand the First Amendment, because it gives the benefit of every doubt to regulatory censorship.

In fact, the dissent seems to be unaware of the risks presented to free political speech by empowering state actors with vague and broad statutes. The dissent claims that "[d]ecades of campaign finance regulation have not silenced political speech." *Id.* at 97. While this is a matter of opinion, not evidence, it hardly helps the dissent, for political debate in this country has never had to navigate regulations as vague and overbroad as those before us in this case.

The dissent, however, does make its own overbroad assertions about the effect this opinion will have on the place of money and the level of transparency in politics, *see post* at 100-101; yet, in doing so, it ignores the limited nature of our holding, which we have emphasized throughout. We repeat that the important task of ensuring electoral integrity leaves considerable room to regulate within constitutional bounds. We repeat also that North Carolina remains free to, *inter alia*, impose disclosure and reporting requirements on political candidates and committees, so long as it does so in accordance with *WRTL* and *McConnell*. North Carolina is also free to regulate all traditional political committees — for example, those controlled by candidates, political parties, or those created by corporations and unions. *See* N.C. Gen. Stat. § 163-278.6(14)(a)-(c) (2007). But the legislation challenged in this case represents a giant step beyond these Supreme Court decisions. The state here seeks to expand its control so that it may regulate not only electoral advocacy, but pure political speech, as well.

Debate on political issues can be reasoned and calm. It can also be passionate, long-winded, funny, uplifting, dull, or downright outrageous. Whatever it is, speakers ought to be able to engage in it without wondering all the while whether a regulator now possessed of unprecedented discretion will find they have committed the mortal sin of uttering "the functional equivalent of express advocacy." Our dissenting colleague would permit the state to oversee political speech — no questions asked. The dissent would force political speech to

navigate the Scylla of vagueness and all its chilling effects and the Charybdis of impossibly intricate regulation, which even the cognoscenti may be unable to divine. Indeed, the dissent replaces the Supreme Court's faith in the workings of the First Amendment with a faith in the powers of government to manage what we say on what matters most. This approach surrenders to the state an awesome control over those political issues that determine the quality of our democracy and the values that give purpose and meaning to our lives.

## VI.

To summarize our decision: we hold North Carolina's statutory attempt to use context to identify communications in support of or opposition to a candidate, N.C. Gen. Stat. § 163-278.14A(a)(2), facially unconstitutional; North Carolina's use of "a major purpose" test to identify political committees, N.C. Gen. Stat. § 163-278.6(14), *amended by* N.C. Sess. Laws 2007-391, facially unconstitutional; and North Carolina's $4,000 contribution limit, N.C. Gen. Stat. § 163-278.13, unconstitutional as applied to NCRL-FIPE and other similarly situated entities.The decision of the district court is thus

*AFFIRMED IN PART AND REVERSED IN PART*.

**Volume 2 of 2**

MICHAEL, Circuit Judge, dissenting:

North Carolina has enacted, within the bounds of the First Amendment, a campaign finance law that is aimed at promoting transparency and openness in the electoral processes of that state. Today the majority strikes down key provisions in that law and severely restricts the well-established power of a state to regulate its elections. One result will be that organizations and individuals will be able to easily disguise their campaign advocacy as issue advocacy, thereby avoiding regulation. The majority thus allows these organizations and individuals to conceal their identities, spend unlimited amounts on campaign advertising masked as discussion of issues, and "hide themselves from the scrutiny of the voting public." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 197 (2003) (internal quotation marks omitted). Another result is that there can be no limits on the size of contributions to independent political committees. Allowing unlimited contributions to these political committees is a heavy blow to the state's interest in combating the "'pernicious influence'" of too much money in politics. *See id.* at 115 (quoting *United States v. Int'l Union United Auto., Aircraft & Agric. Implement Workers of Am.*, 352 U.S. 567, 572 (1957)).

First, the majority invalidates, as unconstitutional on its face, the North Carolina Act's test for determining whether a political advertisement "support[s] or oppose[s] the nomination or election of one or more clearly identified candidates." N.C. Gen. Stat. § 163-278.14A(a)(2). The test allows factors — such as timing, cost, reach, and language — to be considered in determining whether an advertisement "*could only be interpreted* by a reasonable person as advo-

cating the nomination, election, or defeat" of a specific candidate in a specific election. *Id.* (emphasis added). This objective test is constitutional because sufficient governmental interests justify the minimal burden it places on speech. Furthermore, the test is vital to the North Carolina Act because, as the Supreme Court has recognized, the most effective campaign advertisements often couch their message in subtle language, thereby avoiding regulation in the absence of a more encompassing test like North Carolina's. *McConnell*, 540 U.S. at 127. The majority's elimination of this test means that much electoral advocacy in North Carolina will be free of contribution limits, disclosure requirements, and limits on corporate and union spending.

Second, the majority strikes down North Carolina's definition of political committee — an organization with "a major purpose" of electoral advocacy. § 163-278.6(14)d. The majority requires use of the words "the major purpose" that appear in *Buckley v. Valeo*, 424 U.S. 1, 79 (1976) (per curiam). *Buckley* holds that "groups engaged purely in issue discussion" may not be regulated as political committees. *Id.* Nothing in *Buckley* suggests that placing the article "the" before "major purpose" is an absolute requirement. Nothing in *Buckley* prevents a state from concentrating on the word "major" and regulating organizations with "a *major* purpose" of electoral advocacy. The regulation is clear because, after all, a major purpose is simply a principal or conspicuous purpose, one that will be readily detectible. Completely excluding organizations that have electoral advocacy as *a* major purpose will allow many politically active organizations to escape regulation and hide their identities and activities from public scrutiny.

Finally, the majority strikes down North Carolina's contribution limits, § 163-278.13, as applied to independent expenditure committees. In doing so, the majority ignores that North Carolina has met its burden for imposing such limits. The state has provided substantial evidence of the corrupting influence of independent expenditures in the political process. There is no constitutional basis for depriving the state of an important tool — limits on contributions to independent committees — in combating this corruptive influence.

I respectfully dissent.

I.

I begin with an overview of Supreme Court precedent.

The power of the legislative branches to regulate elections "is well established." *Buckley v. Valeo*, 424 U.S. 1, 13 (1976) (per curium). Accordingly, for over a century Congress and state legislatures have enacted legislation "to purge . . . politics of what was conceived to be the pernicious influence of 'big money' campaign contributions." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 115 (2003) (quoting *United States v. Int'l Union United Auto., Aircraft & Agric. Implement Workers of Am.*, 352 U.S. 567, 572 (1957)) (internal quotation marks omitted); *see also Auto. Workers*, 352 U.S. at 570-76. In an effort to protect against the "political potentialities of wealth" that "shake the confidence of the plain people of small means of this country in our political institutions," legislatures have imposed a variety of regulations on the financing of political campaigns. *McConnell*, 540 U.S. at 115, 116 (quoting *Auto. Workers*, 352 U.S. at 571, 577-78) (internal quotation marks omitted).

The Supreme Court has reviewed these legislative efforts with "'considerable deference,'" *McConnell*, 540 U.S. at 117 (quoting *Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 209 (1982)), because of the vital governmental interests in protecting "the 'free functioning of our national institutions'" and fostering the confidence of our citizens, *Buckley*, 424 U.S. at 66 (quoting *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 97 (1961)). Foremost among the governmental interests recognized by the Court is that of preventing "the actuality and appearance of corruption resulting from large individual financial contributions." *Buckley*, 424 U.S. at 26. The Court has taken a broad view of this interest. Hence, it has "'recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors.'" *McConnell*, 540 U.S. at 143 (quoting *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 389 (2000)). In addition, the Court has recognized the need for legislative regulation to guard against the appearance of corruption and to prevent "'the cynical assumption that large donors call the tune,'" an assumption that "'could jeopardize the willingness of voters to take part in democratic governance.'" *Id.* at 144 (quoting *Shrink Missouri*,

528 U.S. at 390). The Court has further recognized that the unrelenting and imaginative efforts of some political participants to circumvent almost every new campaign finance regulation qualifies as "'a valid theory of corruption,'" a theory that is sufficient to justify prophylactic laws that extend beyond the regulation of direct political contributions. *Id.* (quoting *Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 457 (2001)). Thus, the Court has held that the weighty governmental interest in preventing political corruption and its appearance justifies a broad range of regulations, including prohibitions on certain campaign expenditures and contributions from general treasury funds of for-profit corporations, nonprofit corporations, and unions; federal caps on contributions to and from state and federal political parties, state and federal candidates, and political committees; public disclosure requirements for political contributions and expenditures; comprehensive regulation of political committees; and limits on how and for whom a candidate or political party can solicit funds. *See, e.g.*, *McConnell*, 540 U.S. at 133-224; *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146 (2003); *Nat'l Right to Work*, 459 U.S. 197; *Buckley*, 424 U.S. at 23-38, 60-84; *Burroughs v. United States*, 290 U.S. 534, 544-48 (1934).

The Court has also recognized several additional important governmental interests that justify disclosure requirements. "Disclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek . . . office." *Buckley*, 424 U.S. at 66-67 (citation omitted). "[R]ecordkeeping, reporting, and disclosure requirements are also an essential means of gathering the data necessary to detect violations" of substantive regulations. *Id.* at 67-68; *see McConnell*, 540 U.S. at 196. Furthermore, the government has a significant interest in "assuring that disclosures are made promptly and in time to provide relevant information to voters." *McConnell*, 540 U.S. at 200.

Of course, our inquiry into the validity of a campaign finance regulation does not end with the recognition of important governmental interests. We must examine the degree to which the regulation burdens First Amendment rights and evaluate whether the governmental interests are sufficient to justify that burden. *See, e.g.*, *Buckley*, 424 U.S. at 68. Thus, because limits on political contributions "entail[ ]

only a marginal restriction upon the contributor's ability to engage in free communication," *Buckley*, 424 U.S. at 20, these regulations are "closely drawn to match [the] sufficiently important interest" of preventing corruption and its appearance. *McConnell*, 540 U.S. at 136 (internal quotation marks omitted); *see also Buckley*, 424 U.S. at 25. Likewise, disclosure requirements "do not prevent anyone from speaking," *McConnell*, 540 U.S. at 201 (internal quotation marks and alteration omitted), although they can "infringe on privacy of association and belief guaranteed by the First Amendment," *Buckley*, 424 U.S. at 64. We therefore require that "there be a 'relevant correlation' or 'substantial relation' between [an important] governmental interest and the information required to be disclosed." *Id.* (citations omitted); *see McConnell*, 540 U.S. at 196. Regulations requiring disclosure of campaign-related contributions and expenditures and those requiring political committees to make regular reports meet this test. *See Buckley*, 424 U.S. at 68, 79-82.[1]

In one specific area — complete bans on independent political expenditures — the Supreme Court has held that "the governmental interest in preventing corruption and the appearance of corruption is inadequate to justify" the regulation. *Id.* at 45. Unlike other campaign regulations, bans on independent expenditures "impose direct and substantial restraints on the quantity of political speech." *Id.* at 39. They are unconstitutional as a general proposition because they leave the speaker no alternative forum for speech.

In *Buckley* and the cases that followed, the Supreme Court established these clear rules for determining whether a campaign finance regulation is overly broad. Nonetheless, the majority inexplicably questions the well-established proposition that "the burdens imposed on political speech and the state's interests may vary by the type of regulation." *Ante* at 38. This refusal to accept decades of Supreme Court precedent highlights the majority's fundamental misunderstanding and resulting misapplication of the law. Instead of applying precedent, the majority employs its own theory — that any regulation of

---

[1]Such regulations can, however, pose an unconstitutional burden if those regulated are able to show evidence of threats or reprisals as the result of the disclosures. *See McConnell*, 540 U.S. at 197-99; *Buckley*, 424 U.S. at 69-72.

campaign expenditures or contributions amounts to a direct and there-fore inherently suspect restraint on speech, regardless of the type of regulation. As a result, the majority requires all regulations to meet an improperly high bar in order to pass constitutional muster. *See, e.g., ante* at 9-16 (applying test from *Wisconsin Right to Life, Inc. v. Federal Election Commission*, ___ U.S. ___, 127 S.Ct. 2652 (2007), developed in the strict scrutiny context, to strike down portions of North Carolina's contribution, disclosure, and political committee regulations); *id.* at 23 (striking down political committee definition because "narrower means exist"); *id.* at 38 (refusing to distinguish between types of regulations because "[s]peakers are going to have to contend with [the] same infirmities for both expenditures and contri-butions regardless of . . . the regulatory context"). In contrast, the Supreme Court requires that in an overbreadth challenge we consider each regulation's actual burden on speech and weigh that burden against the governmental interests that justify it. Further, the "strong medicine" of overbreadth may only be applied to strike down a statute when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, ___ U.S. ___, ___, 128 S. Ct. 1184, 1190 n.6 (2008) (internal quotation marks omitted); *see McConnell*, 540 U.S. at 207.

In addition to the requirement that an election regulation may not be overly broad, the regulation may not be unconstitutionally vague. As the majority explains, to overcome vagueness concerns, a regula-tion must be sufficiently clear to avoid "foster[ing] arbitrary and dis-criminatory application," and it must "give fair notice to those to whom [it] is directed." *McConnell*, 540 U.S. at 223 (quoting *Buckley*, 424 U.S. at 41 n.48; *Am. Commc'ns Ass'n. v. Douds*, 339 U.S. 382, 412 (1950)) (internal quotation marks omitted).

To succeed in a facial challenge, a plaintiff must carry the "heavy burden of proving" that a regulation is overly broad, *McConnell*, 540 U.S. at 207, or vague. As the Supreme Court recently explained in rejecting a facial challenge to a state election regulation, "[f]acial challenges are disfavored for several reasons." *Id.* at 1191. Facial challenges "often rest on speculation," "run contrary to the fundamen-tal principle of judicial restraint," and, perhaps most important, "threaten to short circuit the democratic process by preventing laws

embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* Instead of following these instructions to tread carefully in assessing facial challenges, the majority impermissibly relies on "hypothetical and imaginary" examples, many of which were not even posited by the plaintiffs, to strike down North Carolina's regulations. *Id.* at 1190 (internal quotation marks omitted).

The contested provisions of the North Carolina Act are well within the boundaries established by the Supreme Court, as the following discussion makes clear.

## II.

The majority holds N.C. Gen. Stat. § 163-278.14A(a)(2) unconstitutionally overbroad and vague. It is neither.

### A.

Section 163-278.14A provides regulators (and likewise, speakers) guidance for determining whether "communications are 'to support or oppose the nomination or election of one or more clearly identified candidates.'" § 163-278.14A. The guidance provided in § 163-278.14A is important to the Act because many of its regulations hinge on whether a given communication "supports or opposes the nomination or election of one or more clearly identified candidates." This operative phrase is used in the separate definitions of "contribution," "expenditure," "independent expenditure," "political committee," and "referendum committee." § 163-278.6(6), (9), (9a), (14), (18b). These activities or organizations are, in turn, regulated throughout the Act in the following ways. Political committees and referendum committees are subject to regular reporting requirements and must have a designated treasurer to keep accurate records. § 163-278.7 to .11. Candidates, committees, and individuals must disclose information about their contributions and expenditures. § 163-278.8, .9, .9A, .11, .12, .39. Contributions to a political committee, referendum committee, or candidate are capped at $4000 per donor, per election. § 163-278.13.[2] Finally, certain types of corporations and labor unions are

---

[2]Contributions to candidates for the state supreme court and court of appeals are capped at $1000. § 163-278.13(e2).

forbidden from making contributions or expenditures, except from segregated funds. § 163-278.19. The words "support or oppose" also appear in a provision requiring additional disclosures for "television and radio advertisements supporting or opposing the nomination or election of one or more clearly identified candidates." § 163-278.39A.

Section 163-278.14A has two parts that describe the evidence that a regulator can use to determine, for enforcement purposes, whether a communication "supports or opposes" a candidate. The first part, which the plaintiffs do not challenge, lists specific words and phrases that, when used, are a means of determining whether a communication "supports or opposes" a specific candidate. § 163-278.14A(a)(1). These phrases include a list of "magic words," such as "vote for" and "reject," similar to those set forth in *Buckley*. *See Buckley*, 424 U.S. at 44 n.52. The second part allows regulators to consider additional evidence if a specific phrase or word listed in the first part does not appear in the communication. Under the second part, a regulator may consider "[e]vidence of financial sponsorship of communications whose essential nature expresses electoral advocacy to the general public and goes beyond a mere discussion of public issues in that they direct voters to take some action to nominate, elect, or defeat a candidate in an election." § 163-278.14A(a)(2). However,

> [i]f the course of action is unclear, contextual factors such as the language of the communication as a whole, the timing of the communication in relation to events of the day, the distribution of the communication to a significant number of registered voters for that candidate's election, and the cost of the communication may be considered in determining whether the action urged could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election. *Id.*

The majority, using a rigid test that it has developed with no support in precedent, holds that § 163-278.14A(a)(2) is overly broad and vague.

## B.

I begin by explaining how the majority seriously misconstrues Supreme Court precedent with respect to the regulation of express

electoral advocacy and issue advocacy. In *Buckley* the Supreme Court found the definition of "expenditure" in the Federal Election Campaign Act of 1971 (FECA), 86 Stat. 3 (1972), *as amended by* 88 Stat. 1263 (1974), to be vague and potentially overbroad. *Buckley*, 424 U.S. at 40-45, 79-80. In order to ensure that FECA's expenditure limitations hewed to the purposes of the statute, and thus were not overbroad, *Buckley* interpreted the term "expenditure" to apply only to "communications that in express terms advocate the election or defeat of a clearly identified candidate." *Id.* at 44. In addition, the Court provided several examples of words ("vote for," "elect," "support") that would appear in communications that fit its definition of "express advocacy." *Buckley*, 424 U.S. at 44 & n.52, 80. Several circuit courts interpreted *Buckley* to mean that any definition of express advocacy in state campaign finance regulations must be limited to speech that includes only "magic words" such as those listed in *Buckley*. *See, e.g.*, *N.C. Right to Life, Inc. v. Leake* (*NCRL II*), 344 F.3d 418, 424-27 (4th Cir. 2003), *vacated*, 541 U.S. 1007 (2004).

In *McConnell*, however, the Supreme Court rejected this interpretation of *Buckley*, emphasizing that

> a plain reading of *Buckley* makes clear that the express advocacy limitation, in both the expenditure and disclosure contexts, was the product of statutory interpretation rather than a constitutional command. In narrowly reading the FECA provisions in *Buckley* to avoid problems of vagueness and overbreadth, we nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same express advocacy line.

*McConnell*, 540 U.S. at 191-92 (footnote omitted). *McConnell* explained that, instead of requiring a formal division between different types of advocacy, the First Amendment allows legislatures to craft their own regulations as long as they do not directly prohibit speech and are sufficiently related to important concerns about the electoral process. Congress operated within these bounds in enacting the Bipartisan Campaign Reform Act of 2002 (BCRA), 116 Stat. 81 (2002), because

> *Buckley*'s magic words requirement is functionally meaningless. Not only can advertisers easily evade the line by

eschewing the use of magic words, but they would seldom choose to use such words even if permitted. And although the resulting advertisements do not urge the viewer to vote for or against a candidate in so many words, they are no less clearly intended to influence the election. *Buckley*'s express advocacy line, in short, has not aided the legislative effort to combat real or apparent corruption, and Congress enacted BCRA to correct the flaws it found in the existing system.

*Id.* at 193-94 (citations and footnotes omitted).

In rejecting the notion "that the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy" that only allows regulation of express advocacy, *id.* at 193, the Court in *McConnell* refused to declare BCRA's regulation of "electioneering communications" unconstitutional simply because it failed to incorporate the *Buckley* express advocacy test. Instead, *McConnell* examined the regulation for overbreadth and vagueness and concluded that it was both substantially related to its campaign regulation purpose and sufficiently clear, and thus facially constitutional. *Id.* at 189-211. *McConnell* holds that courts may no longer require legislatures "to treat so-called issue advocacy differently from express advocacy." *Id.* at 194. Rather, courts must allow legislatures to craft carefully, within the general limits imposed by the First Amendment, regulations to respond to the changing realities of modern electoral advocacy, including efforts to circumvent every new round of regulation. Accordingly, when courts review a facial challenge to a campaign finance regulation, *McConnell* requires that deference be accorded to legislative decisions about the types of communications that should be regulated. A regulation may be struck down only if it is unconstitutional in a substantial number of applications or is too vague to provide notice.

Of course, because a facially valid election regulation can have unconstitutional applications, the regulation remains susceptible to a proper as-applied challenge. *See Wis. Right to Life, Inc. v. Fed. Election Comm'n (WRTL I)*, 546 U.S. 410 (2006) (per curium). Thus, in *Federal Election Commission v. Wisconsin Right to Life, Inc. (WRTL II)*, ___ U.S. ___, 127 S. Ct. 2652 (2007), a plurality of the Court concluded that BCRA § 203's prohibition of "electioneering communica-

tions" (approved on its face in *McConnell*) could not be applied to a specific broadcast, unless that broadcast "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 127 S. Ct. at 2667 (opinion of Roberts, C.J.). According to the Court, this is "the proper standard for an *as-applied challenge*" to a statute that is permissible on its face. *Id.* at 2666 (emphasis added). This standard does not affect *McConnell*'s holding that § 203 is facially constitutional. Holding a statute facially unconstitutional requires "'prohibiting all enforcement'" of the statute, a drastic result that can only be justified if the statute's "application to protected speech is substantial." *McConnell*, 540 U.S. at 207 (quoting *Virginia v. Hicks*, 539 U.S. 113, 120 (2003)). Section 203 is facially constitutional because it does not, on its face, apply to a substantial amount of protected speech; it mostly applies to "election-related advertising," which can be constitutionally regulated. *Id. McConnell* necessarily recognizes, however, that the section might be applied to protected speech in limited circumstances. *Id. WRTL II*'s reasonableness test by its own terms is only designed to identify and remedy this small subset of unconstitutional applications of an otherwise facially valid election regulation.

Ignoring the Court's distinction between as-applied and facial challenges, the majority claims that *McConnell* and *WRTL II* established a bright line rule for facial challenges that divides acceptable regulations (covering express advocacy) from unacceptable regulations (covering issue advocacy). *All* election regulations are unconstitutional unless they expressly adhere to the majority's strict construct, which is as follows. The majority first, and uncontroversially, states that any election regulation is facially constitutional if it is limited to regulating specific "magic words." If, however, a legislature wishes to regulate any speech that avoids the magic words, the majority would require the statute to include (exactly) the following formulation on its face: (1) the exact terms required by the definition of "electioneering communication" in BCRA, that is, the communication must (a) refer to a clearly identified candidate (b) within 60 days of a general election or 30 days of a primary election and (c) be able to be received by 50,000 or more persons in the candidate's district or state, *see* 2 U.S.C. § 434(f)(3)(A)(I), (C); *and* (2) the communication must be "susceptible of no reasonable interpretation other than as an

appeal to vote for or against a specific candidate." *Ante* at 11. This narrow, rigid approach has several fatal flaws.

First, the majority fails to recognize that *McConnell* explicitly "rejected the notion that the First Amendment requires [legislatures] to treat so-called issue advocacy differently from express advocacy." *McConnell*, 540 U.S. at 194. Instead of drawing a rigid line between speech that can and can not be regulated as the majority does today, the Court granted legislatures leeway to craft election regulations that meaningfully address the realities of modern electoral advocacy — as long as those regulations are substantially related to the government's important interests in protecting the democratic process. *See id.* at 189-94. Unlike the majority, *McConnell* grants deference to these legislative judgments by requiring courts reviewing facial challenges to conduct traditional vagueness and overbreadth analyses in determining whether regulations comply with the First Amendment.

Second, the majority holds, as a constitutional rule, that an election regulation that goes beyond *Buckley*'s magic words is permissible only if it adopts the exact requirements Congress imposed in BCRA for "electioneering communications." *See ante* at 11 ("[T]he [regulated] communication *must* qualify as an 'electioneering communication' defined by [BCRA] . . . ." (emphasis added)). But the only support the majority cites for this proposition is a footnote in *WRTL II* — a case analyzing an as-applied challenge to the direct expenditure limit in BCRA § 203. *Id.* The *WRTL II* footnote responds to a concern that the plurality's reasonableness test is too vague by admonishing the reader to "keep in mind" that the test is also limited by "the bright line requirements of BCRA § 203." 127 S. Ct. at 2669 n.7. Nowhere does *WRTL II* state that the specific requirements of BCRA § 203 are the only way that a statute could be sufficiently clear; nor does *WRTL II* even purport to adopt BCRA's requirements to avoid overbreadth. Furthermore, in addition to BCRA § 203, the Supreme Court has found various formulations of regulatory language to be acceptable, especially in areas other than direct expenditures limits, even though they encompass more speech than *Buckley*'s definition of express advocacy. *See, e.g.*, *Buckley*, 424 U.S. at 23 n.24 (allowing regulation of contributions made for "political purposes"); *McConnell*, 540 U.S. at 170 n.64, 184-85 (upholding regulation of "a communication that 'refers to a clearly identified candidate . . . and

that promotes or supports a candidate . . . or attacks or opposes a candidate'" (quoting 2 U.S.C. § 431(20)(A)(iii))). The majority clearly errs by mandating the elements of BCRA § 203, which is simply an *example* of a clear and sufficiently tailored statute, as an essential part of any campaign regulation.

Third, the majority fails to recognize that the *WRTL II* reasonableness test for the "functional equivalent of express advocacy" was developed to determine whether, in *the actual application of BCRA § 203*, an organization could be forbidden from broadcasting a particular advertisement. *McConnell* had already held that, *in a facial challenge*, the regulator need only show that a statute is not vague or overbroad. *McConnell*, 540 U.S. at 192. According to *McConnell*, BCRA's definition of "electioneering communication" — a communication that refers to a clearly identified candidate; is made within 60 days of a general election or 30 days of a primary; and can be received by at least 50,000 persons in the candidate's district or state — withstood vagueness and overbreadth challenges. *Id.* at 189-211. Needless to say, BCRA was not, on its face, required to include *WRTL II*'s reasonableness test.

Fourth, the majority adopts its test without regard for the type of regulation implicated. It ignores the fact that a proper overbreadth analysis considers the burden on First Amendment rights as balanced against the strength of the governmental interest. *McConnell* rejected a bright line test like the majority's and mandated a return to traditional overbreadth analysis. *McConnell*, 540 U.S. at 192, 205. Nonetheless, the majority states that every regulation must pass its test regardless of the actual impact that the regulation has on speech or the governmental interests that might justify it.[3] As a result, the majority's decision to strike down § 163-278.14A(a)(2) on its face means that *no* election regulation is constitutional unless its terms limit its application to extremely narrow circumstances: specifically, all regulations must enumerate words of express advocacy or incorporate

---

[3]Although the majority mentions one important governmental interest — "'limit[ing] the actuality and appearance of corruption,'" *ante* at 10 (quoting *Buckley*, 424 U.S. at 26) — it fails to either conduct an overbreadth analysis or recognize the full range of governmental interests served by election regulations.

BCRA's definition of "electioneering communication" *and WRTL II*'s reasonableness test. The majority imposes this same rule on all types of regulations, whether they be disclosure requirements, contribution limits, political committee definitions, or direct restraints on expenditures. The Supreme Court has consistently applied exactly the opposite rule, subjecting different types of regulations, depending on the burdens imposed on speech, to different levels of scrutiny. If the majority *had* considered the substantive regulations affected by § 163-278.14A(a)(2), it would have recognized that they (inasmuch as they affect the plaintiffs) *do not* impose expenditure limits, the restraint on speech addressed in *WRTL II*. Instead, the majority's rule applies the *WRTL II* analysis to disclosure requirements, contribution limits, and political committee designations. No other court has applied *WRTL II* to all types of campaign finance regulations; instead, every court to address the issue has rejected any application beyond direct limits on corporate expenditures. *See Cal. Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1177 n.4 (9th Cir. 2007) (*WRTL II* analysis is inapplicable to analysis of disclosure requirements); *Citizens United v. Fed. Election Comm'n*, 530 F. Supp. 2d 274, 280-81 (D.D.C. 2008) (same); *Shays v. U.S. Fed. Election Comm'n*, 508 F. Supp. 2d 10, 29 (D.D.C. 2007) (*WRTL II* analysis is inapplicable to coordinated expenditures); *Fed. Election Comm'n v. Kalogianis*, No. 8:06-cv-68-T-23EAJ, 2007 WL 4247795, at *4 (M.D. Fla. Nov. 30, 2007) (*WRTL II* analysis is inapplicable to analysis of corporate contribution limits); *Voters Educ. Comm. v. Wash. State Public Disclosure Comm'n*, 166 P.3d 1174, 1183 n.8 (Wash. 2007) (*WRTL II* analysis is inapplicable to vagueness challenge to political committee definition).

Thus, the majority errs by ignoring *McConnell*'s rejection of any rigid constitutional rule that divides constitutionally protected speech from speech that can be regulated in the area of campaign finance regulation; errs by requiring the exact terms of BCRA referred to in passing by *WRTL II*; errs by ignoring the difference in treatment between facial and as-applied challenges that the Supreme Court requires; and errs by applying the same rule to every type of regulation, rather than conducting an overbreadth analysis based on the purpose and effect of the regulation. Furthermore, because the majority's holding strikes down § 163-278.14A(a)(2) on its face, it strikes down every application of the statute — from disclosure requirements to contribution

limits and even to limits on corporations and unions that North Carolina Right to Life, Inc. (NCRL) has no standing to challenge.[4] The majority's rigid rule lacks any supportable basis: it is constructed from a mixture of ideas that are either taken out of context or extended far beyond precedent. The result, as this case demonstrates, will be the invalidation of many election regulations that have been carefully drafted to honor and comply with First Amendment principles, as established by decades of Supreme Court precedent. When the plaintiffs' overbreadth and vagueness challenges are analyzed under the traditional constitutional standards required by *McConnell* and other relevant precedent, the error in the majority's approach becomes even clearer. I turn now to that analysis.

C.

The majority holds that the definition of "to support or oppose the nomination or election of one or more clearly identified candidates" in § 163-278.14A(a)(2) is unconstitutionally vague. *Ante* at 13. I disagree because the definition gives particularly clear direction to both speakers and regulators, thus meeting the standard for constitutional clarity.

The Supreme Court has explicitly rejected a vagueness challenge to BCRA § 301(20)(A)(iii), which defines a type of "federal election activity" as "a public communication that refers to a clearly identified candidate for Federal office . . . and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate)." 2 U.S.C. § 431(20)(A)(iii); *see McConnell*, 540 U.S. at 170 n.64. The Court held that "[t]he words 'promote,' 'oppose,' 'attack,' and 'support' clearly set forth the confines within which potential . . . speakers must act in order to avoid triggering the provision." *McConnell*, 540 U.S. at 170 n.64; *see also Voters Educ. Comm.*, 166 P.3d at 1184 (the phrase "in support of, or opposi-

---

[4]Further, it is unclear how striking down part (a)(2) remedies the majority's concerns because the remaining provision states that the magic words are "not necessarily the exclusive or conclusive means" of coming under the "support or oppose" language. § 163-278.14A(a).

tion to, any candidate" in state political committee definition is not unconstitutionally vague).

BCRA § 301(20)(A)(iii) is nearly identical to the "support or oppose" phrase that appears throughout the North Carolina Act. Thus, the legislature need not have provided *any* clarification of "support or oppose" because the Supreme Court has recognized that this phrase is sufficiently clear on its face. Nonetheless, the legislature took pains to provide additional guidance to regulators and speakers by explaining the type of evidence that could be used in determining whether a certain communication actually does "support or oppose the nomination or election of one or more clearly identified candidates." This extra legislative guidance does not render a clear phrase unconstitutionally vague; instead it provides additional clarity and helps to streamline the decision making process when questions arise regarding application of the language to particular communications.

Even considering the clarifying terms outside of their context, as the majority does, their meaning is clear. The first sentence in part (a)(2) allows regulators to consider "[e]vidence of financial sponsorship of communications whose essential nature expresses electoral advocacy to the general public and goes beyond a mere discussion of public issues in that they direct voters to take some action to nominate, elect, or defeat a candidate in an election." § 163-278.14A(a)(2). The majority complains that the phrase "essential nature" is impermissibly vague. *Ante* at 13. "Essential" means "constituting an indispensable structure, core, or condition of a thing : basic, fundamental." *Webster's Third New Int'l Dictionary* 777 (2002). It is plain that the sentence in question clarifies "supports or opposes" to apply only to communications that direct voters to act for or against a candidate. The phrase "essential nature" clarifies that the sentence cannot reach any communication that is incidentally directed at campaign issues; instead the communication's basic message must direct voter action regarding a candidate. *See Fed. Election Comm'n v. Mass. Citizens for Life, Inc.* (*MCFL*), 479 U.S. 238, 249 (1986) ("The fact that [the flier's] message is marginally less direct than 'Vote for Smith' does not change its essential nature.").

The majority also complains that there is a lack of clarity in the remainder of § 163-278.14A(a)(2), which allows a regulator to con-

sider various contextual factors (in an objective light) "[i]f the [regulator's] course of action is unclear" after evaluating the communication under the first sentence of part (a)(2). § 163-278.14A(a)(2). The majority seizes on the quoted phrase as "an explicit confession from the statute itself of its fatal vagueness and overbreadth." *Ante* at 35. But the phrase recognizes the realities of political advocacy; it is not a confession of a fatal flaw. As an initial matter, the legislature cannot be confessing to vagueness and overbreadth in the governing term, "support or oppose," a term the Supreme Court has upheld against both vagueness and overbreadth challenges as I explained above. Rather, the legislature wrote the sentence beginning with the phrase "If the course of action is unclear" to provide additional guidance to regulators. In other words, the legislature acknowledged that in some circumstances a regulator might be assisted by direction beyond the first sentence in part (a)(2) in determining whether a communication "supports or opposes" a candidate; and the legislature then *provided a solution* by spelling out the objective factors.

The majority finally finds fault with the factors listed for consideration in the second sentence of part (a)(2): "'the language of the communication as a whole,' 'the timing of the communication in relation to events of the day,' 'the distribution of the communication to a significant number of registered voters for that candidate's election,' and 'the cost of the communication.'" *Ante* at 13. Again, the majority fails to consider these terms in the context of the entire provision. The terms spell out the factors that "may be considered in determining whether the action urged *could only be interpreted* by a reasonable person as advocating the nomination, election, or defeat of *that candidate* in *that election*." § 163-278.14A(a)(2) (emphasis added). Thus, the evidentiary factors that the majority finds unclear are not the endpoint of the inquiry, but rather they assist the regulator in reaching a clear and objective conclusion. Read as a whole, the second part of the "support or oppose" test provides an objective basis for a regulator to determine whether a communication is clearly, and indisputably, electoral advocacy. The majority's decision to strike down this test blocks the legislature's careful effort to provide the maximum amount of guidance. The majority concludes that "North Carolina remains free to enforce all campaign finance regulations that incorporate the phrase 'to support or oppose the nomination or election of one or

more clearly identified candidates.'" *Ante* at 40. Under this ruling North Carolina can best accomplish its goals by eliminating § 163-278.14A entirely, providing no explanation or direction for how regulators should apply the phrase. If this section was eliminated, the remainder of the statute would necessarily survive a facial challenge under *McConnell*, while providing far less guidance than the statute as it stands. The majority would apparently accept this perverse result, overlooking the increase in regulatory discretion that would surely follow.

Section 163-278.14A(a)(2) gives clear guidance to regulators and speakers — significantly more than that required by the Supreme Court. The provision not only carefully defines its reach as covering communications that "support or oppose the nomination or election of one or more clearly identified candidates," a standard effectively identical to one deemed constitutional in *McConnell*. It goes further by indicating the kind of evidence that is relevant to determining whether a communication "supports or opposes" a candidate. According to this provision, the Act's requirements are triggered when the communication either (1) uses one of the exact words or phrases specified or (2) could *only* be objectively interpreted "as advocating the nomination, election, or defeat" of a *specific* candidate in a *specific* election and is *not* a "mere discussion of public issues." § 163-278.14A(a)(2). And the Act provides *yet more* guidance by directing a regulator to consider the timing, cost, reach, and language of the communication in determining whether a communication is electoral advocacy, thereby ensuring that the Act's reach is limited. *Id.* Finally, if there is any remaining question of ambiguity, a potential speaker may seek further guidance from regulators, who must issue a binding advisory opinion, an option the plaintiffs in this case chose not to pursue. § 163-278.23; *see McConnell*, 540 U.S. at 170 n.64; *Buckley*, 424 U.S. at 40 n.47; J.A. 125. Section 163-178.14A(a)(2) — replete with direction to regulators and notice to speakers — is not unconstitutionally vague.

### D.

Applying its new and rigid rule, the majority also holds § 163-278.14A(a)(2) to be overbroad. Again, I disagree.

To decide whether a regulation impermissibly restricts protected speech, we must "look to the extent of the burden that [the regulation] place[s] on individual rights" and "determin[e] whether [the governmental] interests are sufficient to justify" that burden. *Buckley*, 424 U.S. at 68. The level of governmental interest required (either important or compelling) and the degree to which the regulation must be tailored to that interest depends on the type of regulation imposed. Thus, a court must look directly to the limits imposed by the regulation — an examination the majority fails to undertake.

1.

I begin with the terms of the regulation to determine whether its reach is sufficiently related to its purpose of protecting the electoral process. On its face § 163-278.14A(a)(2) limits the Act's regulations to clear electoral advocacy. Section 163-278.14A explains the "evidence" that shows "that communications are 'to support or oppose the nomination or election of one or more clearly identified candidates.'" § 163-278.14A. This section provides guidance to regulators enforcing the substantive provisions of the Act. Again, part (a)(1) of the section provides a list of examples of the types of words that may be used to determine that a communication is electoral advocacy. Part (a)(2) provides additional direction when the communication does not use an enumerated word or phrase. As discussed below, part (a)(2), the challenged part, is facially valid under the First Amendment.

Section 163-278.14A(a)(2) begins by allowing a regulator to consider "[e]vidence of financial sponsorship of communications whose essential nature expresses electoral advocacy to the general public and goes beyond a mere discussion of public issues in that they direct voters to take some action to nominate, elect, or defeat a candidate in an election." This sentence restates *Buckley*'s express advocacy test through the language used by the Supreme Court in *MCFL*, rather than through the examples of specific words. In *MCFL* the Court noted that even though a flier describing candidates' voting records on abortion and urging readers to "VOTE PRO-LIFE" did not use the same language cited in *Buckley* and contained a disclaimer stating that it was not an endorsement of any candidate, it constituted express electoral advocacy. 479 U.S. at 243, 249. The *MCFL* Court explained:

> The Edition [the flier] cannot be regarded as a mere discussion of public issues that by their nature raise the names of certain politicians. Rather, it provides in effect an explicit directive: vote for these (named) candidates. The fact that this message is marginally less direct than "Vote for Smith" does not change its essential nature. The Edition goes beyond issue discussion to express electoral advocacy. . . . The "Special Edition" thus . . . represents express advocacy of the election of particular candidates distributed to members of the general public.

*MCFL*, 479 U.S. at 249-50. In the first sentence of § 163.278.14A(a)(2) North Carolina adopts, with little alteration, the express advocacy test provided in *MCFL*. It thus requires that the communication's "essential nature" constitute "express[ ] electoral advocacy" and "go[ ] beyond a mere discussion of public issues" to direct "the general public" to vote for or against a specific candidate. § 163-278.14A(a)(2); *MCFL*, 479 U.S. at 249-50.

Thus, like in *MCFL*, the first sentence of part (a)(2) only allows the term "support or oppose" to cover advocacy that directly and explicitly asks the public to vote for or against a candidate. This sentence advises a regulator to look to the text of the communication in order to determine whether it expressly advocates election or defeat of a candidate through the use of different words or symbols than the ones listed in part (a)(1). This sentence is therefore a vital stopgap to prevent easy circumvention of the magic words group, a problem that North Carolina combated in the past. *See* J.A. 867, 1017 (citing advertisements that escaped regulation by avoiding the "magic words" and using instead XXX or a circle with a line through it over the candidate's face). Given that North Carolina adopted the *exact language* used by the Supreme Court in *MCFL* for the express advocacy test in the first sentence of part (a)(2), it is impossible to see how the majority could strike down this language as impermissibly broad.

The second sentence of part (a)(2) allows a regulator to consider additional evidence in determining whether a communication supports or opposes a clearly identified candidate "[i]f the [regulator's] course of action is unclear." § 163-278.14A(a)(2). This evidence is strictly limited to that showing the communication "could only be

interpreted by a reasonable person as advocating the nomination, election, or defeat of [a specific] candidate in [a specific] election." *Id.* Thus, under this provision the substantive terms of the Act may only impact communications that advocate specific *electoral* action for or against a specific candidate in a specific election; the provision ensures that the Act's terms do not impact communications that solely support or oppose *issues*. In other words, the communication must be "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *WRTL II*, 127 S. Ct. at 2667. North Carolina's statute thus clearly and adequately limits the definition of "support or oppose" to electoral advocacy.

The majority holds that the use of "contextual factors," such as those outlined in the second sentence of part (a)(2), is forbidden by *WRTL II. Ante* at 9, 13. The majority simply misreads *WRTL II. WRTL II* rejected consideration of certain factors that would show the "*subjective intent*" of the sponsor of the communication, which was "irrelevant in an *as-applied* challenge." 127 S. Ct. at 2668 (emphasis added); *see id.* at 2664-66 (distinguishing *McConnell*'s holding that the "electioneering communication" prohibition survived a *facial* challenge because studies showed that the majority of covered ads were "intended to influence the voters' decisions," *McConnell*, 540 U.S. at 206). Further, *WRTL II* explicitly recognized that "[c]ourts need not ignore basic background information that may be necessary to put an ad in context." *WRTL II*, 127 S. Ct. at 2669. The contextual inquiry must, however, be limited to the *objective* nature of the communication. *Id.* at 2668-69. Thus, nothing in *WRTL II* says that the North Carolina legislature may not allow for the consideration of context in the application of its *objective* test for determining whether a communication is the functional equivalent of express advocacy. In fact, *WRTL II* adopts just such an objective test, relying like North Carolina on a "reasonable interpretation" of the effect of the communication. That the majority takes issue with North Carolina's "could only be interpreted by a reasonable person" standard is nothing short of remarkable in light of its (the majority's) clear approval of *WRTL II*'s "reasonable interpretation" test. *See ante* at 13. In addition, the factors listed in part (a)(2) closely track the BCRA requirements that — at least as a facial matter — are constitutional. Like BCRA § 203, part (a)(2) focuses on timing in relation to an election, clear identification of a specific candidate, and "distribution of the communication

to a significant number of registered voters for that candidate's election." § 163-278.14A(a)(2). *Compare* 2 U.S.C. § 434(f)(3)(A)(i) (requiring clear identification of a candidate, time frames, and "target[ing] to the relevant electorate").

In writing the second part of its test for determining support of or opposition to a candidate, North Carolina sought to cover all electoral advocacy, including "phony issue ads." J.A. 1027. This governmental interest was clearly recognized by the Supreme Court in *McConnell* when it upheld regulations of "public communication[s] that promote[ ] or attack[ ] a clearly identified federal candidate," because such communications "directly affect[ ] the election in which [the candidate] is participating." *McConnell*, 540 U.S. at 170; *see also id.* at 185 (allowing Congress to respond to "[t]he proliferation of sham issue ads"). If anything, *McConnell* and *WRTL II* provide further support for part (a)(2), which limits the definition of "support or oppose" to an objective test like the one approved by *WRTL II*. Thus, by adopting § 163-278.14A(a)(2), the North Carolina legislature worked to cover all express electoral advocacy and guard against circumvention of its regulations, while still protecting true issue advocacy from any unconstitutional regulatory burden.

2.

Section 163-278.14A does not operate alone; its purpose is to define the Act's substantive terms. Therefore, we can only truly understand any burdens imposed by the provision, and the various governmental interests that support it, by considering how it is used in the Act's substantive regulations. The Act imposes four general types of regulation: political committee organizational requirements, disclosure requirements, contribution limits, and limits on expenditures by certain types of corporations and labor unions. I go through each of these categories of regulation to determine whether § 163-278.14A(a)(2) defines "support or oppose" in a way that causes the substantive regulations to impose burdens that outweigh the governmental interests that justify them. I conclude — using the second part of the definition of "support or oppose" — that the regulations are sufficiently correlated to important governmental interests, and therefore the second part does not render the Act's regulations overbroad.

First, the Act imposes a regulatory burden on any group that "makes, or accepts anything of value to make, contributions or expenditures" and "[h]as as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates." § 163-278.6(14). Such a group, by this definition, is a political committee and is therefore subject to regular reporting of its contributions and expenditures and is required to designate a treasurer who has record keeping responsibilities. § 163-278.7 to .11. As long as the definition of political committee does not "reach groups engaged purely in issue discussion," but instead covers groups focused on "the nomination or election of a candidate," the Supreme Court has approved regulation of such groups (or political committees) as sufficiently tailored to important governmental interests. *Buckley*, 424 U.S. at 79. The phrase "support or oppose the nomination or election of one or more clearly identified candidates," with the attendant requirements that limit its meaning, is, if anything, more narrowly focused to the governmental purpose of regulating political committees than *Buckley*'s formulation — "the nomination or election of a candidate." Even the majority recognizes that political committee regulations can permissibly reach organizations that have the primary objective of "influencing elections." *Ante* at 24. It is inexplicable how, given this (correct) understanding, the majority can then limit the political committee definition only to organizations sponsoring communications that either use the magic words or comply with both BCRA's requirements and the *WRTL II* test. In limiting the political committee definition to those groups involved in sponsoring express electoral advocacy, according to § 163-278.14A, North Carolina has developed a more narrowly tailored political committee definition than that required by the Supreme Court. Thus, § 163-278.14A(a)(2) is not overly broad as it applies to the definition of political committee.

Second, the Act imposes several different types of reporting and disclosure requirements when money is spent to "support or oppose" a candidate. Candidates, political committees, and referendum committees must regularly report their contributions and expenditures, unless these are less than $3000 for an election cycle. § 163-278.7, .9, .9A, .10, 10A, .11. Individuals must periodically report contributions or independent expenditures exceeding $100. § 163-278.12. In addition, all advertisements funded through contributions or expenditures must contain certain disclosures about their sponsors and the candi-

dates they support, unless they are funded through an independent expenditure from an individual who has spent less than $1000 in the election cycle. § 163-278.38Z, .39, .39A, .39C. Disclosure of funding information related to communications that "support or oppose the nomination or election of one or more clearly identified candidates" does not prohibit speech. *See McConnell*, 540 U.S. at 201. Nor have plaintiffs offered any evidence that such disclosure subjects them to threats or reprisals. *See McConnell*, 540 U.S. at 197-99; *Buckley*, 424 U.S. at 69-74. Disclosure requirements do burden (rather than prohibit) speech. The Act's disclosure requirements, as circumscribed by § 163-278.14A(a)(2), only cover campaign-related contributions and expenditures, not pure issue advocacy. Disclosure of campaign-related financing has a substantial relationship to the accepted governmental interests of "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions." *McConnell*, 540 U.S. at 196; *see Buckley*, 424 U.S. at 66-68. Furthermore, even if § 163-278.14A(a)(2) did encompass more speech than that allowed by the *WRTL II* test, the Supreme Court has not adopted that test for disclosure requirements and, indeed, has approved of disclosure requirements for otherwise constitutionally protected speech. *See Cal. Pro-Life Council*, 507 F.3d at 1177 n.4; *Citizens United*, 530 F. Supp. 2d at 281 (citing *MCFL*, 479 U.S. at 259-62; *Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley*, 454 U.S. 290, 297-98 (1981); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 791-92 & n.32 (1978)); *see also Cal. Pro-Life Council*, 507 F.3d at 1181 (approving disclosure provision that allows regulators to consider "the surrounding circumstances" to determine whether "a payment" was "made . . . [f]or the purpose of influencing . . . the action of voters for or against the . . . election of a candidate"). As a result, § 163-278.14A(a)(2) is not overbroad in its application to disclosure requirements.

Third, the Act imposes a $4000 cap on contributions to candidates or political committees, and the same limit on contributions from a political committee, for each election cycle. § 163-278.6(6), 13.[5] As the Supreme Court has recognized, contribution limits "impose[ ]

---

[5]Again, the Act imposes a $1000 limit on contributions for some judicial candidates. § 163-278.13(e2).

only 'a marginal restriction upon the contributor's ability to engage in free communication.'" *McConnell*, 540 U.S. at 120 (quoting *Buckley*, 424 U.S. at 20-21). North Carolina defines "contribution" as payment of "anything of value whatsoever, to a candidate to support or oppose the nomination or election of one or more clearly identified candidates, to a political committee, to a political party, or to a referendum committee." § 163-278.6(6). Thus, the limits only cover contributions for clear electoral advocacy under the objective test in § 163-278.14A and contributions to or from a group that is focused on engaging in this type of advocacy (again defined by § 163-278.14A). Because the limits on money given to support clear electoral advocacy bear a substantial relationship to the governmental purpose of preventing corruption and the appearance thereof, and only marginally burden speech, these limits are constitutional. Indeed, the Supreme Court has upheld limits on "contributions" defined much more broadly than the term in the North Carolina Act. *See Buckley*, 424 U.S. at 23-35 (upholding limit on "contributions" defined as "[f]unds provided to a candidate or political party or campaign committee either directly or indirectly through an intermediary[, or] dollars given to another person or organization that are earmarked for political purposes," 424 U.S. at 24 n.24); *McConnell*, 540 U.S. at 170 (upholding contribution caps for a "public communication that promotes or attacks a clearly defined candidate"); *see also Fed. Election Comm'n v. Beaumont*, 539 U.S. 146 (2003) (upholding a *ban* on any contributions from NCRL's general treasury). Thus, the use of § 163-278.14A(a)(2) in defining contribution is not overly broad.

Fourth, the Act makes it "unlawful for any corporation, business entity, labor union, professional association or insurance company" to (1) "make any expenditure to support or oppose the nomination or election of a clearly identified candidate" or (2) "make any contribution to a candidate or political committee." § 163-278.19(a)(1). The provision excepts segregated funds of these entities, incorporated political committees, and non-profit, non-shareholder corporations that have an educational or social mission. § 163-278.19(b), (f), (g). NCRL (a non-profit) and its segregated funds — North Carolina Right to Life Political Action Committee (NCRL-PAC) and North Carolina Right to Life Committee Fund for Independent Political Expenditures (NCRL-FIPE) — are thus clearly excluded from the reach of this provision. As a result, the plaintiffs in this case cannot

allege any "injury in fact" and thus do not have standing to challenge § 163-278.14A as it is used to define the reach of § 163-278.19. *See McConnell*, 540 U.S. at 225-30. Nonetheless, ignoring this threshold jurisdictional requirement, the majority strikes down North Carolina's regulation of corporate and union spending on electoral advocacy that avoids the use of the magic words.[6]

The majority claims that I give "short shrift" to *WRTL II* in this analysis. *Ante* at 34. However, as I explained above, every court that has considered the application of *WRTL II* outside the expenditure limit context has determined that *WRTL II* is not relevant when considering contribution limits, political committee regulations, or disclosure requirements. *See supra* at 66. There is good reason that these courts have recognized *WRTL II*'s limited applicability. The Supreme Court has consistently distinguished expenditure limits, which impose a direct restraint on speech and therefore are subject to strict scrutiny, from other campaign finance regulations that do not directly limit speech and thus are subject only to intermediate scrutiny. Further, despite the majority's assertions, even if *WRTL II* did apply (which it does not), the majority misstates the *WRTL II* test as requiring "the brightline requirements of BCRA § 203." *Ante* at 34 (internal quotation marks omitted). Thus, the majority is correct that I "never

---

[6]Even if the plaintiffs could demonstrate standing to challenge the use of § 163-278.14A(a)(2) to define the term "expenditure" in the context of corporate expenditure limits, they could not prevail on their claim. The Supreme Court has held that direct expenditure and contribution limits on such entities are constitutional regulations, not "'complete ban[s]' on expression," because corporations have the opportunity to engage in advocacy through the use of segregated funds (such as, for instance, NCRL's use of NCRL-PAC). *McConnell*, 540 U.S. at 204 (quoting *Beaumont*, 539 U.S. at 162). These regulations are justified by the compelling governmental interests of avoiding "the corrosive and distorting effects" of corporate involvement in politics as well as "circumvention of valid contribution limits." *Id.* at 205 (internal quotation marks and alterations omitted). In this case, as described above, the Act only regulates express advocacy and its functional equivalent, as defined by the Supreme Court. Because § 163-278.19 limits contributions and expenditures that clearly advocate for or against a specific candidate in a specific election, it is clear that the provision does not limit a substantial amount of pure issue advocacy. *See id.* at 203-09.

claim[ ] that § 163-278.14A(a)(2) meets [the majority's] standard." *Id.* at 34. I do not apply this standard because, for the many reasons I have outlined above, it is both unsupported and irrelevant to the challenge before us today.

The majority further complains that I am "unable to identify a single case that has upheld a definition of the 'functional equivalent of express advocacy' as broad as § 163-278.14A(a)(2) since the Supreme Court's *WRTL [II]* decision." *Ante* at 37. I, like the majority, have cited no cases applying *WRTL II*'s test for a simple reason: no court has applied this test beyond its context — an as-applied challenge to a direct expenditure limit. *See Citizens United*, 530 F. Supp. 2d at 278-80 (determining, as the only court after *WRTL II* to apply the test, that an advertisement qualified as the functional equivalent of express advocacy and was properly prohibited under BCRA); *see also supra* at 66. Thus, the majority is also unable to identify a single case that has taken the extreme measure of striking down a portion of a contribution, political committee, or disclosure regulation as facially invalid using *WRTL II*'s functional equivalent test. Nor can the majority find cases prior to *WRTL II* that take such a drastic step. In contrast to the absence of authority for the majority's position, I have cited decades of Supreme Court precedent that approves definitions at least as broad the one employed by North Carolina to clarify the reach of contribution, political committee, and disclosure regulations. *See, e.g.*, *McConnell*, 540 U.S. at 170 & n.64 (approving support or oppose language); *MCFL*, 479 U.S. at 249 (employing "essential nature" language); *Buckley*, 424 U.S. at 79 (approving definition of political committee as a group focused on "the nomination or election of a candidate"); *id.* at 24 n.24 (approving definition of contribution as funds "that are earmarked for political purposes"). Simply put, the majority cites no relevant support for its conclusion because none exists.

In sum, the plaintiffs have failed to show that § 163-278.14A(a)(2) is overly broad on its face. The provision does not, on its face, cover a substantial amount of pure issue advocacy. Instead, its terms limit its application to communications that both "go[ ] beyond a mere discussion of public issues" *and* either expressly direct voters to take specific electoral action on behalf of "a clearly identified individual" or could, under an objective standard sanctioned by *WRTL II*, only be

understood as urging specific electoral action. The provision limits North Carolina's imposition of political committee regulations, disclosure requirements, contribution ceilings, and corporate contribution and expenditure restrictions to communications that direct voters to vote for or against a specific candidate in a specific campaign. The regulations that apply to the plaintiffs in this case only marginally burden speech, and they are justified by sufficient governmental interests, meeting the tests for constitutionality established by *Buckley* and *McConnell*. Nonetheless, the majority refuses to apply the test established by the Supreme Court and strikes the provision down as "patently overbroad" in all of its applications in this facial challenge. *Ante* at 38. The majority fails to provide any guidance for states attempting to regulate elections, noting instead that "[a]t some point . . . enough is simply enough." *Ante* at 42. But such vague and conclusory assessments are an insufficient basis for overturning the will of the people of North Carolina through a blanket invalidation of a statutory provision. Perhaps in rare instances the statute could prove to be unconstitutional in its application. But today's case gives us no facts that would support such an as-applied challenge. Nor do the plaintiffs come close to carrying their heavy burden of showing that the regulation would chill a substantial amount of protected speech. Thus, I would hold § 163-278.14A(a)(2) constitutional on its face.

### III.

The majority also holds that North Carolina's definition of political committee unconstitutionally burdens political expression because it embraces organizations with "*a* major purpose" (rather than "*the* major purpose") of supporting or opposing a candidate. The majority holds that states must rigidly adhere to a formulation enunciated in *Buckley v. Valeo*, 424 U.S. 1 (1979) (per curiam). *Buckley*, however, only defined the outer limits of permissible political committee regulation when it held that regulation in this area (1) *cannot* cover "groups engaged purely in issue discussion" and (2) *can* cover groups "the major purpose of which is the nomination or election of a candidate." *Buckley*, 424 U.S. at 79. *Buckley* left room for legislative judgment within these limits, so long as the resulting regulation does not prohibit a substantial amount of non-electoral speech. Because North Carolina's definition of political committee does not cover "groups engaged purely in issue discussion" and gives organizations the

option to create segregated funds to protect non-campaign related information, it has a substantial relationship to the several important governmental interests it serves. The definition is therefore constitutional.

A.

In *Buckley* the Supreme Court applied a narrowing construction to FECA's definition of "political committee" in order to avoid concerns about constitutional vagueness and overbreadth. 424 U.S. at 79. Under FECA this term encompassed "'any committee, club, association, or other group of persons which receives contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000.'" *Id.* at 79 n.105. Both "contributions" and "expenditures" were defined "in terms of the use of money or other valuable assets 'for the purpose of . . . influencing' the nomination or election of candidates for federal office." *Id.* at 77. Once designated a political committee, a group was subject to registration and reporting requirements similar to those imposed by the North Carolina Act. *See id.* at 60-63; N.C. Gen. Stat. § 163-278.7, .8, .9, .11, .13; *see also N.C. Right to Life, Inc. v. Bartlett* (*NCRL I*), 168 F.3d 705, 712 (4th Cir. 1999).

FECA did not define the phrase "for the purpose of influencing." *See Buckley*, 424 U.S. at 77. Because the definition of political committee incorporated this phrase, the Court expressed concern that "groups engaged purely in issue discussion" would be encompassed in the definition of political committee and subjected to regulation. *Buckley*, 424 U.S. at 79. Accordingly, it adopted a narrowing construction of the term "[t]o fulfill the purposes of the Act." *Id.* Thus, the Court construed the definition to "only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.* With the definition of political committee so construed, the definition of "expenditure" did not need to be interpreted narrowly in the context of political committee disclosure requirements because the political committee expenditures were, "by definition, campaign related." *Id.* Given the Supreme Court's interpretation, the definition of political committee was not unconstitutionally vague; nor was the disclosure law overly broad because it served substantial governmental interests in enforc-

ing the contribution limits, deterring corruption and the appearance thereof, and providing valuable information to voters. *Id.* at 76-82.

NCRL argues that, in order to ensure that North Carolina's regulations are not vague or overly broad, the state must adopt word for word the language suggested by *Buckley*. Thus, the North Carolina legislature violated the Constitution by drafting the statute to require that election activity be "*a* major purpose" of an organization rather than "*the* major purpose." The majority errs in its wholesale adoption of this argument. As I will explain, *Buckley* did not establish a bright line rule; rather, it established parameters that were adhered to by the North Carolina legislature.

### B.

Unlike the definition of "political committee" in *Buckley*, the North Carolina Act's definition of the term is clear on its face. The Act defines "political committee" as

> a combination of two or more individuals . . . that makes, or accepts anything of value to make, contributions or expenditures and has one of the following characteristics:
>
> a. Is controlled by a candidate;
>
> b. Is a political party or executive committee of a political party or is controlled by a political party or executive committee of a political party;
>
> c. Is created by a corporation, business entity, insurance company, labor union, or professional association pursuant to G.S. 163-278.19(b); or
>
> d. Has as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates.

N.C. Gen. Stat. § 163-278.6(14).

The majority argues that the use of "a major purpose" rather than "the major purpose" in § 163-278.6(14)d renders the statute unconstitutionally vague because, although regulators and speakers can easily determine "*the* major purpose" of an organization, they are left "with absolutely no direction" as to how to determine "*a* major purpose" of an organization. *Ante* at 22. The majority reasons that groups and regulators can determine what is "*the* major purpose" of an organization by considering whether it "explicitly states in its by-laws or elsewhere, that influencing elections is its primary objective, or if the organization spends the majority of its money in supporting or opposing candidates." *Ante* at 22. Of course, consistent with *Federal Election Commission v. Massachusetts Citizens for Life* (*MCFL*), 479 U.S. 238 (1986), the majority does not specify these factors as the only ones a regulator may consider in determining "the major purpose" of an organization. *Ante* at 22 n.6; *see MCFL*, 479 U.S. at 241-42, 252 n.6, 262 (concluding that the plaintiff's "central organizational purpose [was] issue advocacy," based on its articles of incorporation, the sources of its funding, its activities, and how extensive its campaign related spending was). Thus, a regulator's determination of "*the* major purpose" of an organization allows for a fact specific analysis of a group's organizational documents, its finances, its activities, and other relevant factors. The majority fails to explain why this same analysis would be appreciably more difficult for a regulator to apply in determining whether electoral advocacy is "*a* major purpose" of an organization.

It is clear that the same analysis can be used for both phrases. The key word providing guidance to both speakers and regulators in "the major purpose" test or "a major purpose" test is the word "major," not the article before it. "Major" means "notable or conspicuous in effect or scope : considerable, principal." *Webster's Third New Int'l Dictionary* 1363 (2002). Thus, regardless of whether a regulator is identifying "a major purpose" or "the major purpose" of an organization, the regulator considers the same evidence to determine whether electoral advocacy constitutes a considerable or principal portion of the organization's total activities.

Likewise, an organization is just as able to determine whether electoral advocacy comprises one of its major purposes as it is able to determine whether such activity is "the major purpose." NCRL con-

firmed its own ability to make this determination at oral argument, when its counsel emphatically stated that advocacy for a candidate was *not* any of its major purposes. And, again, if a group is concerned about how it might be categorized, the North Carolina Act makes binding advisory opinions available. § 163.278.23; *see McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 170 n.64 (2003); *Buckley*, 424 U.S. at 40 n.47. Thus, because North Carolina's "a major purpose" test is just as clear as a "the major purpose" test to both speakers and regulators, it is not unconstitutionally vague.

## C.

In addition, the substitution of "a" for "the" in *Buckley*'s major purpose test does not expand the reach of the Act in any way that overly burdens First Amendment freedoms. In arriving at the major purpose test to avoid overbreadth, *Buckley* expressed concern that requiring disclosure of expenditures (broadly defined) by "groups engaged purely in issue discussion" would not serve the campaign-related purposes of FECA. 424 U.S. at 79. Instead of conducting the same sort of overbreadth analysis used in *Buckley*, which gives proper deference to other branches of government, the majority again applies a new, rigid requirement: all state political committee definitions must adopt, word for word, *Buckley*'s definition of such a committee.

The substitution of "a" for "the" in the political committee definition would only render the definition unconstitutional if it resulted in limiting a substantial amount of pure issue advocacy.[7] As an initial matter, North Carolina's political committee regulations require a committee to designate a treasurer to keep accurate financial records, make regular periodic disclosures of income and disbursements if it receives or spends more than $3000 during an election, and limit each political contribution it receives or makes in an election cycle to $4000. § 163-278.7 to .11. While these regulations may impose sub-

---

[7]The reporting requirements would also be an unconstitutional burden on associational rights if the disclosure of donor information resulted in threats or reprisals to donors, a claim that must be substantiated with evidence for the plaintiffs to prevail. *See Buckley*, 424 U.S. at 69-72. While the majority expresses a concern about reprisals or threats throughout its opinion, the record contains no evidence to support that concern.

stantial obligations in the administration of a political committee, *NCRL I*, 168 F.3d at 712, under Supreme Court precedent they impose only marginal restrictions on speech, *see McConnell*, 540 U.S. at 201; *Buckley*, 424 U.S. at 20-21. Of course, even marginal restrictions on speech may not be imposed on pure issue advocacy groups, because those restrictions would not serve important governmental interests. *Buckley*, 424 U.S. at 79. But North Carolina's "a major purpose" test runs little risk of encompassing pure issue advocacy groups or discouraging non-campaign related speech. First, as I have discussed, North Carolina requires that direct campaign advocacy be "a *major* purpose" of the group. *NCRL I*, 168 F.3d at 712. Heeding our holding in *NCRL I*, the state was careful to exclude organizations with only "incidental" campaign related purposes. *Id.* Further, the definition of political committee can not possibly cover organizations engaging solely in issue advocacy; instead, the organization must focus a considerable or principal amount of its activities on campaigning for or against a clearly defined candidate before those activities become a *major* purpose of the organization. *See Webster's Third New Int'l Dictionary* 1363.

Furthermore, North Carolina's contribution limits and disclosure requirements create lesser burdens on speech than other requirements that have been upheld by the Supreme Court. The Supreme Court has approved a ban on *any* political contributions from issue-based non-profit corporations. *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146 (2003). Such a ban imposes a far greater burden than subjecting a group with "a major purpose" of electioneering to disclosure requirements and contribution limits.[8] Additionally, as *Beaumont* advised, organizations that meet the "a major purpose" test can avoid disclosure requirements and contribution limits on non-campaign related work by creating segregated political committees, such as NCRL has done with NCRL-PAC and NCRL-FIPE. The regulations would not

---

[8]In fact, North Carolina adopted the "a major purpose" test as a more limited attempt to address the corrosive effect of non-profit election spending after this court struck down the state's ban on expenditures and contributions from the general treasury funds of non-profit corporations. J.A. 975 (deposition of the bill's sponsor, state representative Philip A. Baddour); *see NCRL I*, 168 F.3d at 713-14. Of course, after *Beaumont*, *NCRL I*'s holding as it relates to contribution bans has been abrogated.

reach the parent organization in this circumstance because at most it would only engage in an incidental amount of electoral advocacy.

The majority also argues that the "a major purpose" language overburdens issue advocacy groups because it forces them to divulge information to defend against political committee designation. *Ante* at 23. However, the substitution of "a" for "the" in the test poses no greater burden on an organization defending against political committee designation. Under either formulation, an organization must divulge the same type of information with respect to purpose in defending against designation.

Furthermore, North Carolina has important interests in regulating political parties with a major purpose of electoral advocacy. Again, these interests include preventing corruption and the appearance of corruption in the electoral process, providing information to voters, and providing data to regulators to assist with enforcement of the law. *See supra* at 55-56. North Carolina's political committee definition is closely drawn to these interests. In tailoring its statute, North Carolina heeded *Buckley*'s concern that regulation of "groups engaged purely in issue discussion" would not be sufficiently correlated to the governmental interests that justify regulation. *See Buckley*, 424 U.S. at 79. Thus, North Carolina's statute, which only regulates organizations with a major campaign-related purpose, is closely tailored to governmental interests.[9]

In fact, the Act is tailored to address a fundamental organizational reality. As NCRL's counsel concedes, most organizations — including NCRL — do not have just one major purpose. For example, NCRL states that its two major purposes are educating to promote life and lobbying at the state and national levels and its minor purpose is occasionally supporting or opposing specific candidates. Because NCRL's campaign-related activities are incidental to its overall activities, it would not be subject to regulation as a political committee. On the other hand, some other organization might spend forty-five percent of its resources on lobbying and forty-five percent of its

---

[9]North Carolina has also tailored the reporting requirements to its interests by only requiring groups that spend or collect more than $3000 during an election to file reports. § 163-278.10A.

resources on supporting or opposing specific candidates. The purposes of the contribution limits and disclosure provisions of the Act — providing information to voters, preventing corruption and the appearance thereof, and enforcing the other provisions of the Act — are closely tied to regulating such an organization because it must be heavily focused on electoral advocacy to have that activity constitute one of its major purposes.

The majority argues that North Carolina should employ "narrower means . . . to achieve its regulatory objective," namely, requiring what it characterizes as "one-time reporting" of campaign-related expenditures and contributions for all organizations unless they meet the "the major purpose" test. *Ante* at 23-24. But the majority errs in requiring North Carolina to employ the least restrictive means of achieving its goals. The narrow tailoring analysis does not apply to the political committee regulations at issue here (disclosure and reporting requirements and contribution limits); under *Buckley* the state must only show "relevant correlation" between its interests and the regulation. *See Buckley*, 424 U.S. at 64, 78-79 (quotation marks omitted); *see also McConnell*, 540 U.S. at 136. Thus, the "possibility" of "less restrictive means" suggested by the majority, *ante* at 44, does not defeat North Carolina's regulation. Moreover, this tepid requirement would *not* be sufficiently correlated with the state's interest. It is a minimalist approach for regulating organizations with a major purpose of electoral advocacy; it would significantly undermine the state's interest in data collection and deterrence because it would allow these organizations to avoid the careful accounting and regular reporting requirements that enable the state to undertake prompt investigation of incidents of potential misconduct. *See Buckley*, 424 U.S. at 59-68. Furthermore, the majority's holding also strikes down on their face the contribution limits imposed by § 163-278.13 for organizations that fit the "a major purpose" test. The state has a clear interest in limiting extremely large contributions to organizations that then spend that money on direct electoral advocacy. *See Buckley*, 424 U.S. at 23-35 (upholding limit on "dollars given to another person or organization that are earmarked for political purposes," 424 U.S. at 24 n.24). The majority's suggestion that groups with a major purpose of electioneering be subjected only to minimal reporting requirements (and no contribution limits) would be ineffective and would defeat the state's important interests in regulating electoral advocacy.

North Carolina's political committee definition establishes limits on contributions and requires disclosures by organizations centrally engaged in electoral advocacy. To the extent that the regulations impact an organization's issue advocacy by requiring disclosure of all donor information and financial receipts and disbursements and by imposing limits on all contributions to it, the regulations encourage groups to set up separate political committees for their electoral advocacy. The availability of this option both limits any burden on a group's issue advocacy and furthers the state's interest in transparency in electoral advocacy. *See Beaumont*, 539 U.S. 146 (upholding federal ban on contributions from NCRL, with the alternative of a segregated fund). Not only does the majority ignore this option entirely, but its holding also actively discourages this positive approach. The majority effectively encourages advocacy groups to circumvent the law by *not* creating political action committees and instead to hide their electoral advocacy from view by pulling it into the fold of their larger organizational structure. When electoral advocacy comprises "a major purpose" of the organization rather than the organization's only purpose, the organization can avoid the bookkeeping requirements, regular reporting, and contribution limits imposed on political committees. This result is decidedly not required by the First Amendment.

North Carolina has devised a standard that addresses organizational reality and is careful not to frustrate issue advocacy or general political speech. The statute only reaches organizations with direct electioneering as a *major purpose* and leaves options that allow those organizations to avoid regulation of any of their pure issue advocacy. Because the provision restricts issue advocacy even less than regulations approved by the Supreme Court and is closely matched to important governmental interests, I would hold it constitutional on its face.

IV.

The majority also strikes down the Act's $4000 contribution limit insofar as it applies to "independent expenditure political committees" such as NCRL-FIPE.[10] In taking this drastic step, the majority adopts

---

[10]The plaintiffs do not argue that the disclosure and reporting provisions applicable to "political committees" should not apply to NCRL-FIPE, and the majority's holding does not reach these other provisions.

a "crabbed view of corruption, and particularly of the appearance of corruption." *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 152 (2003).

In contrast to its other two holdings, the majority avoids the temptation to create some new rigid rule for contribution limits. But, while the majority properly states the overbreadth test, it strikes down the contribution limit by relying on our vacated decision in *North Carolina Right to Life, Inc. v. Leake* (*NCRL II*), 344 F.3d 418 (4th Cir. 2003), and ignoring the Supreme Court's recent decisions. As the majority recognizes, contribution caps are subject only to heightened scrutiny (rather than strict scrutiny) because they do not directly limit the donor's speech and do not preclude association. *McConnell*, 540 U.S. at 134-36; *Buckley v. Valeo*, 424 U.S. 1, 20-23 (1975) (per curiam). Instead, they allow organizations to receive (substantial, in this case) contributions from individual donors and to make expenditures of any amount they wish. Thus, contribution limits are permissible if they are "closely drawn to match a sufficiently important interest." *McConnell*, 540 U.S. at 136 (internal quotation marks omitted). In this context, the Supreme Court has recognized important governmental interests in preventing corruption, the appearance of corruption, and circumvention of election regulations. *Id.* at 136-37, 144, 185. The greater the novelty of the state's justification, the more evidence it must provide to support the regulation. *Id.* at 144.

The majority quotes our vacated opinion in *NCRL II* in concluding that North Carolina's concerns about the corruptive influence of contributions to independent expenditure committees are "'implausible.'" *Ante* at 28 (quoting *NCRL II*, 344 F.3d at 434). In light of the Supreme Court cases decided after our last opinion, I disagree with this assessment. *McConnell* requires courts to accept as plausible that corruption can extend beyond the "*quid pro quo* corruption inherent in" contributions and expenditures expressly coordinated with a candidate. 540 U.S. at 152 (internal quotation marks omitted). Courts should allow legislatures to address corruption or the appearance thereof that is indicated by factors such as the "size [of the contribution or expenditure], the recipient's relationship to the candidate or officeholder, [the contribution's or expenditure's] potential impact on a candidate's election, its value to the candidate, or its unabashed and explicit intent to purchase influence." *Id.*

*McConnell* found support for this expanded understanding of corruption in, among other cases, *California Medical Ass'n v. Federal Election Commission* (*Cal-Med*), 453 U.S. 182 (1981). *Cal-Med* upheld a provision of FECA in response to a facial overbreadth challenge. As *McConnell* explained, the FECA provision "restricted . . . the source and amount of funds available to engage in express advocacy and numerous other noncoordinated expenditures." 540 U.S. at 152 n.48. In his concurrence in *Cal-Med* Justice Blackmun stated that the provision would likely be unconstitutional if applied to groups making independent political expenditures rather than groups that coordinate their expenditures with a candidate. *Cal-Med*, 453 U.S. at 203 (Blackmun, J., concurring). *McConnell* rejected Justice Blackmun's reasoning, explaining that *Cal-Med* held the FECA provision constitutional *on its face*, even though the provision clearly imposed limits on contributions for independent political expenditures. 540 U.S. at 152 n.48. In other words, if the governmental interests only justified regulation of coordinated expenditures — as Justice Blackmun argued — the statute would have been facially overbroad (and therefore unconstitutional) because it imposed limits on *all* groups making expenditures. *Id.* But *Cal-Med* held that the provision was *not* facially overbroad, so (according to *McConnell*) the First Amendment *must* allow legislatures to regulate contributions to fund independent political expenditures. *Id.* Despite *McConnell*'s clear rejection of the majority's reasoning in this case, the majority relies on Justice Blackmun's concurrence in *Cal-Med* rather than the Supreme Court's recent statement of the law and reading of its precedent. *Ante* at 27.

While ignoring *McConnell*'s interpretation of *Cal-Med* and its approach to corruption, the majority relies on out-of-context quotes from *McConnell* to support its contention that the Court "views political parties as different in kind than independent expenditure committees." *Ante* at 27. The language quoted by the majority is taken from a portion of *McConnell* that addresses an equal protection challenge to BCRA provisions that regulate only political parties (a subset of political committees) and not "special interest groups." *McConnell*, 540 U.S. at 187-88. The Court stated that Congress was "fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation." *Id.* at 188. Thus, the Court allowed Congress to make reasonable distinctions in the drafting of regulations. The Court did not,

however, mandate that all legislatures reach the same conclusions as Congress about the difference between political parties and interest groups (or for that matter the difference between political committees and independent expenditure groups). Nor did the Court mandate that all legislatures draw lines of distinction in exactly the same way.

Indeed, as described above, *McConnell* recognized the "more subtle but equally dispiriting forms of corruption" that could result from backdoor involvement of formally "independent" individuals and groups in the federal political process — even without explicit coordination with candidates. *Id.* at 153-54. The legislature, with its strong interest in avoiding circumvention of the law, thus has the right to make reasonable predictions and adopt prophylactic measures. *Id.* at 185; *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 159 (2003). Within these parameters, *McConnell* rejected overbreadth challenges to federal regulation of groups and individuals that operated independently from federal candidates. *Id.* at 154-56 (upholding limits on contributions to federal political parties), 162-73 (upholding limits on contributions to state and local political parties), 174-81 (upholding a ban on party solicitations for, and contributions to, tax-exempt organizations), 184-85 (upholding restrictions on state candidates and officeholders).

Because of the Supreme Court's awareness of the influence brought to bear on federal campaigns by groups making independent expenditures, *McConnell* only required "substantial evidence" to support Congress's concern about corruption caused by contributions to state and local party committees, candidates, and officeholders that were formally independent from the federal campaigns. 540 U.S. at 154; *see id.* at 164-65, 176-77, 185. *McConnell* thus recognizes the plausibility of legislative concerns that contributions to fund independent expenditures can lead to the appearance of corruption in the electoral process. *McConnell*'s broader view of corruption means that our reasoning in *NCRL II*, a decision that the Court vacated and remanded for reconsideration in light of *McConnell*, no longer stands on firm ground. North Carolina's regulation of all political committees (whether formally coordinated or independent) is similar to BCRA's regulation of independent individuals and groups, and the reason for regulation — the potential for corruption or the appearance thereof — is likewise similar. Because *McConnell* recognizes that North Caroli-

na's proffered justification for its regulation is plausible, the state must only produce substantial evidence to support its position.

North Carolina has provided a thorough record of the threat of corruption, the appearance of corruption, and the circumvention of election laws that attend the operation of independent expenditure committees. This evidence is sufficient to satisfy the state's burden of showing substantial evidence. The state shows that a vast amount of campaign funding at the national level has shifted from party committees to so-called independent committees. Moreover, the evidence shows that contributors to these independent committees still expect — and have reason to believe — that their contributions will gain them special access to elected officials and allow them to influence the political process. Thomas E. Mann, a respected senior fellow at the Brookings Institution, explains in his declaration the pervasive influence of independent committees and those who fund them, using the 2004 federal campaigns as an example:

> The [national] parties' IEPC [Independent Expenditure Political Committee] strategies were similar. They encouraged people closely and visibly associated with them to form and operate officially independent IEPCs, which the party through its officials and leading members could then identify to donors as appropriate funding vehicles. Those IEPCs could, in turn, because of their management by people so intimately familiar with the needs and aims of the party effectively aid a campaign without any formal coordination. The risk for any donors seeking access and influence was slight. Who contributed was a matter of public knowledge and their money would be, so far as the party itself was concerned, well spent.

> IEPC activities can undermine democratic politics by creating corruption or the appearance of corruption. Some contributions are so large . . . that they would certainly be remembered vividly by party officials and cast doubt in the public's eye that the contributor enjoyed no special influence over or access to the party and its candidates. Spending by IEPCs, moreover, greatly benefits federal candidates and thus has great value to them. Nothing suggests, in fact, that

it is much less effective than spending by the parties themselves. Given the close ties between those who manage the most influential IEPCs . . . and the major political parties and their candidates, actual coordination between the IEPCs and the parties and candidates is unnecessary.

J.A. 325-26.

The campaign waged in North Carolina by the independent group Farmers for Fairness (Farmers) provides another example of the corruptive influence of independent expenditures. Farmers created advertisements directly opposing certain legislative candidates. Instead of simply running the advertisements during election time, Farmers scheduled meetings with legislators and screened the advertisements for them in private. Farmers then explained that, unless the legislators supported its positions, it would run the advertisements *that attacked the candidates on positions unrelated to those advocated by Farmers*. The majority interprets this activity as the "group feel[ing] passionately about an issue and discuss[ing] it." *Ante* at 30. This could not be further from reality. The record reveals that Farmers did not discuss its central issue, deregulation of the hog industry, in its advertisements. Instead, it threatened and coerced candidates to adopt its position, and, if the candidate refused, ran negative advertisements having *no connection* with the position it advocated. This activity is not "pure political speech," *ante* at 46; it is an attempt to use pooled money for behind-the-scenes coercion of elected officials. The majority also opines that inasmuch as Farmers discussed its intention to run the advertisements with the candidates, their activities were coordinated. *Ante* at 30-31. This is simply wrong. A threat cannot qualify as coordination because the targeted candidate would not be willingly cooperating if he or she chose to surrender to the demands of the Farmers group. If the candidate chose not to surrender, and Farmers then made good on its threat to broadcast negative advertisements, it is equally clear that the candidate would not have directed or otherwise cooperated with the airing of the advertisement. The Farmers example shows exactly how independent expenditures can create the same appearance of corruption and potential for actual corruption as do excessively large contributions. The only difference between these two methods (other than, after today's decision, that one may be regulated and the other may not) is that the independent expenditures

made by Farmers had the potential to influence candidates through threats and reprisals, while excessively large direct contributions have the potential to influence candidates by rendering them beholden to the donor. In short, the method may differ, but the corrosive effect on the electoral process remains the same.

These examples are certainly not exhaustive. The record contains hundreds of pages of testimony and reports supporting the judgment of the North Carolina legislature that independent expenditure political committees are sufficiently harmful to the electoral process to justify the $4000 contribution limit.[11] All of these examples show that North Carolina has an important interest in limiting the corruption or appearance of corruption that can stem from large contributions to independent committees with significant informal ties to coordinated committees, political parties, and candidates. The evidence shows that independent expenditures can have a large "potential impact on a candidate's election," and are of great "value to the candidate," even if the committee does not take any direction from a candidate. *See McConnell*, 540 U.S. at 152.

The organizational structure of the plaintiffs in this case further illustrates the legitimacy of North Carolina's concerns about allowing independent expenditure committees to receive unlimited contributions. As the majority notes, NCRL-FIPE is an entity legally separate from NCRL and NCRL-PAC, with the mission of making uncoordinated expenditures. *Ante* at 29 n.8. However, NCRL-FIPE shares facilities, directors, staff, and other resources with NCRL and (especially) NCRL-PAC. Executive meetings and board meetings address issues for all of the various NCRL groups, and the same officers plan strategy and activities and raise funds for all of the NCRL entities. While NCRL-FIPE does not officially coordinate its expenditures with candidates, NCRL and NCRL-PAC *do* coordinate expenditures with candidates and make direct contributions. Thus, at any given

---

[11]North Carolina also cites examples of actual corruption in North Carolina politics, supporting the state's reasonable prediction that state politicians and contributors will likely find and exploit any existing loopholes in campaign finance regulations. *See They Stained State's Honorable Reputation*, The News & Observer, Sept. 9, 2007, at B2 (listing jailed and fined politicians and their crimes).

moment, the same director or staffer is on the one hand ensuring that NCRL-PAC's activities follow a candidate's campaign strategy, while on the other hand "independently" designing NCRL-FIPE's expenditure strategy to promote that same candidate. It is hard to understand how NCRL-FIPE could, whether intentionally or not, avoid incorporating the coordinated campaign strategies used by NCRL-PAC into its own ostensibly independent campaign work. Similarly, it is hard to understand how a donor, approached by the same fundraiser on behalf of both NCRL-PAC and NCRL-FIPE, could not believe that his or her contributions to each would be linked. I do not argue that we should "pierce the corporate veil," *ante* at 29 n.8, or that "NCRL has abused its corporate form," *ante* at 48; the corporate structure here is legitimate. However, under the majority's new rule of constitutional law, organizations are given an explicit green light to use the legal loophole created by today's holding to circumvent campaign finance regulation. The majority's rule exempts from contribution limits NCRL-FIPE and all other independent expenditure committees that are closely intertwined with politically connected groups. The majority's decision enables political advocacy groups to create funds through which they can funnel *unlimited* campaign contributions after large donors have exhausted their ability to contribute directly to candidates or political committees. This approach is a complete rejection of the important governmental interest in limiting the influence of money in politics to prevent the appearance and reality of corruption. The majority's approach also strips the legislature of its right "to anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process." *McConnell*, 540 U.S. at 137.

North Carolina has provided substantial support for its interest in regulating contributions to independent expenditure political committees. The regulation is closely drawn to match the state's interest. The contribution limits are quite accommodating — each individual donor may give up to $4000 to NCRL-FIPE for each election. Much lower contribution limits have been approved by the Supreme Court. *See Randall v. Sorrell*, 548 U.S. 230, ___, 126 S. Ct. 2479, 2493 (2006) (listing state and federal contribution limits). The majority argues that the regulations would "silence" speech. *Ante* at 47. But the law does not limit in any way NCRL-FIPE's ability to engage in political speech; it can amass as much funding as it pleases and spend it all on

campaign advertisements.[12] The regulation allows it to expand its donor base to gather additional funds — a prospect that should invigorate, not detract from, public engagement in the political sphere. *See McConnell*, 540 U.S. at 140. Nor is the speech of its donors particularly limited by the regulation. They still may donate, repeatedly, large sums of money to use on independent expenditures (and donate again to NCRL-PAC the same amount for use as candidate contributions). And they can continue to associate with an organization that supports their ideals and their political agenda. *See McConnell*, 540 U.S. at 141; *Buckley*, 424 U.S. at 22.

In sum, the majority ignores the import of *McConnell* and instead relies on our vacated opinion to characterize North Carolina's interest in the regulation as implausible. By resurrecting our vacated reasoning, the majority places an improperly heavy evidentiary burden on North Carolina, rather than only requiring it to show the substantial evidence necessary after *McConnell*. North Carolina has provided substantial evidence of the corruptive influence of independent expenditures, justifying its contribution limit for *all* political committees. Because the $4000 limit on contributions for each contributor for each election to each independent expenditure committee is closely drawn to the important governmental interest of preventing the reality and appearance of corruption, I conclude that § 163-278.13 is constitutional as applied to NCRL-FIPE and similarly situated groups.

V.

The State of North Carolina has, within constitutional bounds, enacted a campaign finance law that (1) provides an appropriate test for determining whether an advertisement "support[s] or oppose[s] a clearly identified candidate," N.C. Gen. Stat. § 163-278.14A(a)(2); (2) properly defines a political committee as one that has electoral advocacy as "*a* major purpose," § 163-278.6(14)d; and (3) imposes dollar limits on contributions to independent political committees, § 163-

---

[12]Despite its purported concern about the limits on its speech imposed by the $4000 limit on contributions from each contributor, NCRL-FIPE has only raised a total of $3359 since it was created by NCRL and has only spent $339 on its independent expenditures, making it doubtful that the statute limits its ability to speak in any way.

278.13, that are fully justified by substantial evidence of the corrupting influence of independent expenditures in today's politics.

In striking down these provisions, the majority relies almost exclusively on its view that campaign finance regulations are inherently suspect because they directly threaten the "ordinary political speech that is democracy's lifeblood." *Ante* at 14. According to the majority, enforcement of North Carolina's regulations would subject political speech to "layer upon layer of intense regulation," giving states "nearly unbridled discretion to allow or disallow political messages based, *inter alia*, on the regulator's own preferences and predilections." *Ante* at 32. The majority sees "ungovernable complexity" in the regulations that would serve as "a lexicon of bureaucratic empowerment" and would require potential speakers to "hire the best team of lawyers" to "figure out" how to escape penalties for violations. *Ante* at 33, 35, 33. Further, the majority asserts, North Carolina's regulations would "serve as a front for incumbency protection" and "silence [organizations] through regulation," thereby "slowly ridding our democracy of one of its foremost cleansing agents." *Ante* at 47. The majority concludes that I "replace[ ] . . . faith in the workings of the First Amendment with a faith in the powers of government to manage what we say on what matters most," thereby "surrender[ing] to the state an awesome control over those political issues that determine the quality of our democracy and the values that give purpose and meaning to our lives." *Ante* at 50.

The majority characterizes my expressed concerns as "hyperbolic" and "overblown," *ante* at 32, 40, yet apparently sees no irony in making these doomsday-like predictions in support of its own position. My concerns are based on the realities of politics in North Carolina and elsewhere — realities that have been recognized by the Supreme Court, are documented in the record, and provided the basis for legislative action that culminated in passage of the Act. The majority's grave predictions, on the other hand, have no historical foundation. Decades of campaign finance regulation have not silenced political speech or allowed government regulators to run amok and censor speech at whim. North Carolina's Act is simply another effort at reasonable (and necessary) regulation. The Act is the result of the legislature fulfilling its duty to protect the political processes of the state from the undue influence of money. In stopping the state from enforc-

ing key provisions of the Act, the majority severely hobbles the legislature's authority to combat the appearance and reality of corruption in politics.

The majority's approach, as reflected in the statements noted above, "takes a difficult constitutional problem and turns it into a lopsided dispute between political expression and government censorship." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 399 (2000) (Breyer, J., concurring). The majority treats political contributions and expenditures as the equivalent of speech, thus concluding that the regulation of campaign finance restricts "pure political speech." *Ante* at 36, 43, 46, 49. Indeed, the majority appears to favor the argument that "free political speech," that is, political speech immune from campaign finance regulation, "is the best remedy for, rather than a cause of, corruption." *Id.* at 47. This simplistic view of the First Amendment, while popular with some, has been expressly and consistently rejected by the Supreme Court since the time of *Buckley*. The Supreme Court has repeatedly held that the First Amendment guarantee of free speech requires a balance between competing interests in the area of campaign finance regulation. On the one hand, the First Amendment protects the freedom of political expression and association; on the other hand, and no less fundamentally, it protects "the integrity of the electoral process" through which political speech is transformed into governmental action. *Shrink Missouri*, 528 U.S. at 400-01 (Breyer, J., concurring). Because campaign finance regulation "significantly implicates competing constitutionally protected interests in complex ways," the courts (and legislatures) must balance those interests. *Id.* at 402. The majority's First Amendment analysis misinterprets the nature of the interests on one side of the balance and completely fails to consider the other side.

First, "a decision to [spend money to support or oppose] a campaign is a matter of First Amendment concern — not because money *is* speech (it is not); but because it *enables* speech." *Id.* at 400. The regulations at issue here — disclosure requirements, contribution limits, and political committee regulations — may affect speech, but they do not silence it, as Supreme Court precedent makes clear. North Carolina's regulations would have little, if any, constraining effect on the average citizen interested in debating political issues or attempting to influence electoral outcomes. The contribution regulations limit

amounts of *money* donated from each source, but they do not limit the amount of speech the donor or recipient may engage in; the disclosure and political committee regulations ensure an injection of *more*, not less, information about candidates' support and positions into the public sphere. The majority's parade of horribles notwithstanding, "the essential freedom . . . to speak in unfettered fashion on the most pressing issues of the day," *ante* at 32, remains vibrant and protected under the North Carolina regulations, because the regulations stop no one from speaking.

Second, the majority ignores the Supreme Court's longstanding recognition that campaign finance regulations also serve the interest of preserving the vitality of our democratic institutions, which in turn serves the purposes of the First Amendment. As the Court has explained in the context of contribution limits, judicial evaluation of campaign regulations

> reflects more than the limited burdens they impose on First Amendment freedoms. It also reflects the importance of the interests that underlie [regulation] — interests in preventing both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption. . . . [T]hese interests directly implicate the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process. Because the electoral process is the very means through which a free society democratically translates political speech into concrete governmental action, contribution limits, like other measures aimed at protecting the integrity of the process, tangibly benefit public participation in political debate.

*McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 136-37 (2003) (quoting *Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 208 (1982); *Shrink Missouri*, 528 U.S. at 401 (Breyer, J., concurring)) (internal quotation marks and citations omitted).

The majority today fails to recognize this entire side of the constitutional equation and instead focuses exclusively on the First Amend-

ment interest in protecting the right to spend money to influence politics. This one-sided approach has direct implications for the majority's analysis. The majority treats all types of regulations as highly suspect, even though — because money is *not* the exact equivalent of speech — different types of regulations related to campaign financing impose varying burdens on protected activity. The majority thus fails to "show[ ] proper deference to [the legislature's] ability to weigh competing constitutional interests in [this] area in which it enjoys particular expertise." *Id.* at 137. Like Congress and the Supreme Court, North Carolina's legislature has concluded that the unregulated use of money in politics is not, as "some may argue . . . the best remedy for . . . corruption." *Ante* at 47. Instead, it has crafted election regulations that "provid[e] the electorate with relevant information about the candidates and their supporters" and combat "'the corrosive and distorting effects of immense aggregations of wealth'" on the political process. *McConnell*, 540 U.S. at 121, 205 (quoting *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 660 (1990)).

It is not our place to rewrite precedent, even if our beliefs about the First Amendment conflict with those of the Supreme Court. Instead, we should carefully and methodically apply precedent to determine whether North Carolina has overstepped its bounds. The majority sidesteps this process, relying instead on its instinct that "[a]t some point . . . enough is simply enough." *Ante* at 42. On the side of the balance protecting free expression, the majority is right that these regulations could — in some hypothetical case not before us today — affect political expression in an unconstitutional way. But under Supreme Court precedent we may not "go beyond the statute's facial requirements and speculate about hypothetical or imaginary cases," as the majority has done. *Wash. State Grange v. Wash. State Republican Party*, ___ U.S. ___, ___, 128 S. Ct. 1184, 1190 (2008) (quotation marks omitted).

On the other side of the balance, the regulations protect the democratic process by publicizing information about the financial backers of political candidates through disclosure and reporting requirements; the contribution limits further promote broad-based political participation by encouraging candidates and political committees to expand their donor bases. As I have explained, without the Act's clarifying definition of "support or oppose the nomination or election of one or

more clearly identified candidates" in § 163-278.14A(a)(2), those seeking to influence elections will continue to avoid contribution limits and disclosure requirements by thinly disguising their advertisements as issue discussion. As a result, voters will be deprived of valuable information about candidates' supporters, and each donor will be allowed to inject unlimited amounts of money into the political process. Without the "a major purpose" political committee definition in § 163-278.6(14)d, organizations with electoral advocacy as a major purpose will continue to escape regular reporting, accounting, and contribution limits by rejecting transparency and blending their major political activity into their other work. And without the application of contribution limits to independent political committees through § 163-278.13, political groups will continue to exert coercive influence over elected officials without any constraints on the size of contributions from individual donors.

The North Carolina legislature concluded that, on balance, the First Amendment supports these limited and carefully drawn regulations. Nonetheless, without conducting its own balancing as required by precedent, the majority strikes down the provisions at issue today. The majority's decision will not result in more speech or a more reasoned political discourse. Instead, the net result will be a less informed electorate and a step back toward a political system in which large donors call the tune. The plaintiffs have not carried their heavy burden of showing that the regulations lack "a plainly legitimate sweep." *Wash. State Grange*, 128 S. Ct. at 1190 (quotation marks omitted); *see also McConnell*, 540 U.S. at 207. I would therefore reverse the judgment of the district court and remand with the direction that summary judgment be entered in favor of the defendants, the state officials in charge of elections in North Carolina.